435 F.2d 1065
 Mordecai BLUTH, Appellant,
v.
Melvin LAIRD, Secretary of Defense, Stanley R. Resor, Secretary of the Army, Hal B. Jennings, Jr., Surgeon General of the United States Army, Appellees.
 No. 14962.
 United States Court of Appeals, Fourth Circuit.
 Argued October 8, 1970.
 Decided December 23, 1970.
 
 Nathan Lewin, Washington, D. C. (Miller, Cassidy, Larroca & Lewin, Washington, D. C., on brief) for appellant.
 Gilbert K. Davis, Asst. U. S. Atty. (Brian P. Gettings, U. S. Atty., on brief) for appellees.
 Before HAYNSWORTH, Chief Judge, and BOREMAN and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 Plaintiff, Major Bluth, is a physician and an officer in the United States Army who is assigned to DeWitt Army Hospital in Fort Belvoir, Virginia, but who is presently under orders to report for duty in Vietnam. In his complaint filed with the district court, he alleged that the Army had failed to follow its own regulations in (1) processing his "Request for Deletion from Overseas Levy," and (2) refusing to afford him an officers' basic training course prior to being sent overseas. He also alleged that the Army's decision denying him a deferment from overseas duty was arbitrary and irrational, and that as a matter of substantive due process the deferment could not be denied him. The relief sought was mandamus, pursuant to 28 U.S.C.A. § 1361, to compel the Army to comply with its applicable regulations in these two matters, and an injunction, pursuant to 28 U.S.C.A. § 1331, to restrain the denial of procedural and substantive due process of law.
 
 
 2
 Following a hearing, the district judge dismissed the complaint, and, at the same time, dissolved a temporary restraining order which had been issued against the Army's reassigning plaintiff pending the disposition of the case. Upon the denial by the district judge of a motion for an injunction pending appeal, a similar motion was made to a single judge of this court pursuant to Rule 8 of the Federal Rules of Appellate Procedure. In order to avoid the possibility that Major Bluth might be sent overseas before the disposition of this appeal, the motion was granted. Upon consideration of the merits, we reverse on the ground that the record clearly indicates that the Army failed to comply substantially with its own regulations in processing the request for deferment from overseas duty. Because we reach this result, we find it unnecessary to consider if the Army properly waived the requirement that Major Bluth be given basic training and to pass upon Major Bluth's contention that the fifth amendment requires that his deferment request be granted.
 
 
 3
 * Major Bluth enrolled in the Army's "Berry Plan" in September, 1965. Under the terms of this plan, he was to be immediately commissioned a reservist, which in fact occurred in February, 1966, with the condition that he would be ordered to active duty upon completion of his residency in his medical speciality. Prior to the termination of his residency on July 1, 1969, Major Bluth was ordered to report to Fort Sam Houston, Texas, for the officers' basic training course which is required for newly commissioned officers after entry on active duty by Army Regulation 350-5(23) (a) (1). These orders were subsequently revised so that he reported on July 1 directly to DeWitt Army Hospital at Fort Belvoir, Virginia, where he has served as Chief of Anesthesia up to the present time.
 
 
 4
 On October 12, 1969, while at Fort Belvoir, Major Bluth again received orders to report to Fort Sam Houston for the basic training course. However, these orders were also superseded, this time at the instance of the commanding officer of DeWitt Army Hospital who stated that Major Bluth, as the only anesthesiologist at the hospital, was indispensable at that time.
 
 
 5
 Major Bluth received orders on May 12, 1970, reassigning him to Vietnam on August 1, 1970. This prompted him to submit a "Request for Deletion from Overseas Levy" pursuant to Army Regulation 614-30, which deals in part with temporary deferments from overseas duty.[1] The basis of his request was the acute asthmatic condition of his son Simcha, approximately 5½ years old at the time. This condition was first discovered in July, 1966, subsequent to Major Bluth's enrollment in the "Berry Plan." The child's attacks were often so severe that emergency treatment by his father and prolonged periods of hospitalization (in December, 1966, and July, 1967), were required. The affidavits of attending physicians which accompanied Major Bluth's request indicated that the father's absence would have a deleterious effect on the child's health in light of the medical expertise of the father and the inability of the mother and other relatives to help care for the child.[2] In the opinion of the physician who attended Simcha from July, 1966, until June, 1969, "Simcha's health and welfare depend solely upon the close individual medical attention that may be administered by his father, Dr. Bluth, otherwise, the child's life may be compromised."
 
 
 6
 Major Bluth's initial request for deletion from overseas duty was submitted on June 1, 1970. On June 4, his commanding officer, Colonel Robert E. Neimes of the Medical Corps, forwarded the application to the Adjutant General of Fort Belvoir with the following notation: "While this request does not fit the strict criteria as outlined in AR 614-30, I feel there is some merit in the case; therefore, it is forwarded for consideration." A warrant officer, designated "Assistant Adjutant General," wrote on the file "Recommend disapproval," without any further statement, and sent it to the office of the Commanding General of the First Army. On June 20, a Major in the Commanding General's office, also titled "Assistant Adjutant General," forwarded the documents to the Surgeon General's office with the single notation, "Forwarded for consideration."
 
 
 7
 The request was received in the Surgeon General's office by Colonel Dwight F. Morss, who gave the file to both a "Medical Consultant" and a "Psychiatry Consultant." The "Medical Consultant's" remarks stated only that the conditions described in the request failed to meet established criteria of the regulations, without specifying in what respect, and that unfavorable consideration was recommended. The "Psychiatry Consultant" gave the same recommendation, citing as his reason that the conditions described were physical rather than psychiatric in nature.
 
 
 8
 Finally, the file was submitted to a review board within the Surgeon General's office consisting of a member of the Medical Corps, a member of the Nurse Corps, and a member of the Dental Corps. Their complete formal disposition of the case is contained in the following sentence: "Recommend disapproval as based on insufficiently compelling compassionate consideration in accordance with established criteria." This disposition was approved by the Director of Personnel and Training, and Major Bluth was informed of the result.
 
 
 9
 On July 15, Major Bluth submitted an application for reconsideration of his request for deferment from overseas duty. An accompanying affidavit of a doctor at DeWitt Army Hospital noted that the child had suffered further attacks "which have apparently been precipitated by his father's impending departure." This affidavit further stated that it would be "unwise at this time to remove the father from the household." The application was forwarded directly to the Surgeon General's office where a second compassionate review board, consisting of two physicians and the same dentist, denied the request "due to insufficiently compelling medical and compassionate considerations in accordance with established criteria."
 
 
 10
 Prior to filing his second request for deferment from overseas duty, Major Bluth submitted a formal application asking that he be given the officers' basic training course before being sent to Vietnam. This application was denied on the ground that a memorandum of the Deputy Chief of Staff for Personnel, dated February 5, 1970, gave the Surgeon General the power to waive this requirement and "because during his more than one year of active duty this officer has gained sufficient orientation not to warrant his attendance at the Officer Basic Course at the USA Medical Field Service School."
 
 
 11
 Upon notification of this decision, as well as the second denial of his deferment request, Major Bluth filed his complaint in this action on July 28, 1970.
 
 II
 
 12
 Chapter 3 of AR 614-30 deals with temporary deferments. Section 3-1 states generally that the granting of a deferment "results in a temporary under-strength in the oversea command involved which decreases to some extent the operational readiness of that command." As a result "[t]he granting of deferments, therefore, must be carefully and actively controlled and held to an absolute minimum." As further statement of general considerations, this section sets forth that "[n]ormally, consideration will not be given to requests submitted immediately prior to departure from home station when circumstances indicate that the condition has existed for a considerable period of time or if the condition existed or was reasonably foreseeable at the time of entry on active duty."
 
 
 13
 The following section, § 3-2, sets forth the criteria for temporary deferment. Basically, they are two: illness and financial or domestic hardship. There is no claim in this case of financial or domestic hardship so that we need consider only the former criterion as to which the section provides, in pertinent part:
 
 
 14
 Personnel alerted for oversea commands may be granted temporary deferment when compliance with such orders will impose hardship upon the individual or his family under the following criteria:
 
 
 15
 a) Illness of member of the family of the individual (father, mother, spouse, child, sister, brother, or a person in loco parentis), provided that
 
 
 16
 (1) In the opinion of the attending physician, the —
 
 
 17
 (a) * * *; or
 
 
 18
 (b) Illness is of such a nature that the individual's presence is a critical factor of the patient's recovery, whereas his immediate departure will have a serious adverse effect upon the patient; or
 
 
 19
 (c) * * *
 
 
 20
 (2) In the case of 1(a) and (b) above, the condition neither existed nor was reasonably foreseeable at the time of entry on active duty.
 
 
 21
 (3) The individual will continue to be POR qualified at the termination of such deferment.[3]
 
 
 22
 Sections 3-3 and 3-4 of AR 614-30 deal with procedural requirements for submitting and processing applications. Section 3-3(a) requires that the application be submitted "through channels" and specifies the information to be contained. Section 3-3(b) states that "[c]ommanders forwarding application will — (1) Recommend approval, or (2) Recommend disapproval, and reasons therefor." Section 3-4(b) permits intermediary commanders to deny deferments "without referral to Headquarters, Department of the Army, when circumstances obviously do not justify approval under the provisions of this regulation." However, § 3-4(a) requires that all other applications "will be forwarded, with complete justification through channels * * *."[4] This section also states that:
 
 
 23
 The Adjutant General of the installation or activity concerned will review the request for deferment. The letter of transmittal will contain a statement that he has personally reviewed the request and that it is correct, justified, and meets established criteria. (emphasis supplied.)
 
 
 24
 A memorandum from the Office of the Surgeon General, dated December 1, 1966, requires that all requests for temporary deferments based on compassionate circumstances under AR 614-30 must be finally passed upon by a review board consisting of at least three officers, the members to be drawn from a list of certain officers or their designated representatives. The memorandum indicates that the decision of such a board will be the final determination if the Director of Personnel and Training gives his formal approval.
 
 
 25
 On the facts stated, Major Bluth contends that he presented a prima facie case for temporary deferment from overseas duty on the basis of his son's illness but that, in denying his request, the Army failed to follow its own regulations in at least three respects. They are that (1) two of the commanders totally failed to make any recommendation in forwarding the application for temporary deferment notwithstanding the unequivocal command of AR 614-30(3-3) (b), (2) the Assistant Adjutant General, who said "Recommend disapproval," failed to state the "reasons therefor" in violation of AR 614-30(3-3) (b) (2), and (3) the commander of Fort Belvoir made no personal review of the request as AR 614-30(3-4) (a) requires. These omissions, it is argued, entitle Major Bluth to judicial relief.
 
 
 26
 The government counters with the contentions that the assignment of military personnel is a matter of internal management of the military and that it is a discretionary matter to be decided by the Secretary of the Army under such procedures as he may prescribe. Under the principle that "the judiciary [must] be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters," Orloff v. Willoughby, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L. Ed. 842 (1953), the Court should not interject itself into internal affairs of the Army and duty assignments in general. Alternatively, it is argued that Major Bluth was not denied procedural due process of law and hence is not entitled to judicial relief.
 
 III
 
 27
 We are fully mindful of the restricted role of the judiciary with respect to the internal affairs of the Army as exemplified by such decisions as Orloff v. Willoughby, supra; Reaves v. Ainsworth, 219 U.S. 296, 31 S.Ct. 230, 55 L.Ed. 225 (1911); Winters v. United States, 412 F.2d 140 (9 Cir. 1969), cert. den., 396 U.S. 920, 90 S.Ct. 248, 24 L.Ed.2d 200 (1969); Byrne v. Resor, 412 F.2d 774 (3 Cir. 1969); United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371 (2 Cir. 1968), cert. den., 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969); Noyd v. McNamara, 378 F.2d 538 (10 Cir. 1967), cert. den., 389 U.S. 1022, 88 S.Ct. 593, 19 L.Ed.2d 667 (1967); Luftig v. McNamara, 126 U.S.App.D.C. 4, 373 F.2d 664 (1967), cert. den., 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed.2d 1332 (1967); Payson v. Franke, 108 U.S.App.D.C. 368, 282 F.2d 851 (1960), cert. den. sub nom. Robinson v. Franke, 365 U.S. 815, 81 S.Ct. 696, 5 L.Ed.2d 694 (1961). It is, as characterized in Feliciano v. Laird, 426 F.2d 424, 427 (2 Cir. 1970), "extraordinarily limited."
 
 
 28
 On the other hand, neither this Court, nor others to which a similar issue has been presented, has evidenced hesitation in directing the military to comply with its own regulations where it has been shown that a regulation was not followed, and there has been a prima facie showing that a member of the military has been prejudiced thereby. United States ex rel. Brooks v. Clifford, 409 F.2d 700 (4 Cir. 1969); Feliciano v. Laird, supra; Nixon v. Secretary of the Navy, 422 F.2d 934 (2 Cir. 1970) (dictum); Kimball v. Commandant Twelfth Naval District, 423 F.2d 88 (9 Cir. 1970) (dictum); Pitcher v. Laird, 421 F.2d 1272 (5 Cir. 1970); Schatten v. United States, 419 F.2d 187 (6 Cir. 1969). The problem is only one aspect of the broader rule that when the sovereign has established rules to govern its own conduct it will be held to the self-imposed limitations on its own authority, departure from which denies procedural due process of law. United States v. Heffner, 420 F.2d 809 (4 Cir. 1969), and authorities discussed therein. This is not to say that courts will direct the military how to decide the merits of a matter committed to its discretion, unless a clear and unequivocal abuse of discretion has been demonstrated. It is only to say that, in exercising its discretion, the military will be held to the positive commands it has imposed on itself as to what procedures and steps are to be followed in exercising its discretion.
 
 IV
 
 29
 By applying the rules we have stated, we conclude that the denial of Major Bluth's application for temporary deferment from service in Vietnam cannot be sustained, and the Army must be directed to reconsider the application in substantial compliance with the procedures established by AR 614-30. Stated otherwise, the violations of AR 614-30 of the types proved vitiate the denial of the deferment because the Army did not afford Major Bluth the minimum guarantees of procedural regularity set out in the regulation. The Army must reconsider the application in compliance with the procedural requirements of the regulation, pending which "necessary action [shall be taken] to preclude movement from home station of individuals * * until final action on such application has been received." AR 614-30(3-1) (b). We outline the reasons which lead to these conclusions.
 
 
 30
 Major Bluth unquestionably made a prima facie showing that the health of his son would be seriously adversely affected were Major Bluth required to go to Vietnam as per his orders. AR 614-30(3-2) (a) (1) (b). In the processing of the application, there were three substantial departures from the procedures which the regulation established. Colonel Neimes failed to make any recommendation with regard to disposition of the application despite the requirement of the regulation. The Assistant Adjutant General to whom Colonel Neimes sent the papers recommended disapproval without assigning reason therefor as the regulation required. The Adjutant General did not make a personal review of the application as the regulation requires. The office of the Commanding General, to whom the Assistant Adjutant General had made his recommendations, merely "forwarded" the papers "for consideration" to the Surgeon General without the recommendation which the regulation requires.
 
 
 31
 Obviously, the multi-step processing established by the regulation was to provide review by superior authority of the decision of subordinate authority. And to make pointed the review, subordinate authority recommending disapproval was required to assign reasons therefor so that the validity of the reasons could be tested by superior authority. Here, inescapably, there was nothing to review as a result of abdication of the decisional process at various levels and suppression of the reasons to support the decisional process where it was purportedly exercised. The characterization of the Medical Consultant in the Surgeon General's office that the request failed to meet established criteria of the regulations is rendered meaningless by the failure to describe what criteria were referred to and wherein the application was deficient. The same is true of both the initial consideration and reconsideration by the review board when it said initially that there was "insufficiently compelling compassionate consideration" and finally that there were "insufficiently compelling medical and compassionate considerations in accordance with established criteria." In short, failure to comply with the regulations has created the inference that the various levels of authority engaged in "buck-passing" without any real decision on the part of anyone why the application should be granted or refused. Prejudice to Major Bluth is self-evident.
 
 
 32
 The government argues, however, that denial of the deferment was correct because, manifestly, the application shows on its face that Major Bluth's son's condition pre-existed his father's entry upon active service so that the application could not comply with AR 614-30(3-2) (a) (2). We disagree.
 
 
 33
 First, the absence of affirmative recommendations and the absence of any supporting reasons, or meaningful supporting reasons in the several instances in which there was a recommendation that the application be denied, casts doubt on the validity of the argument. No one can be sure what was the basis of decision. Indeed, the two instances in which supporting reasons were attempted to be supplied raise the inference that the government's purported justification was not in the mind of the recommending authority. Thus, initial articulation of the review board in the Surgeon General's office that the application should be disapproved because it was based on "insufficiently compelling compassionate consideration in accordance with established criteria" (emphasis supplied) would hardly suggest that what was meant was that Simcha had serious asthmatic difficulties before July 1, 1969. The same is true of that board's expression on reconsideration that the application only demonstrated "insufficiently compelling medical and compassionate considerations in accordance with established criteria." The government's argument presupposes that AR 614-30(3-2) (a) (2) is an absolute. We do not so read the regulations. Taken alone, this section does say that the illness, to justify temporary deferment, "neither existed nor was reasonably foreseeable at the time of entry on active duty." But the regulations must be read as a whole, and AR 614-30(3-1) (b), significantly, employs the word "normally" in stating that temporary deferment will not be granted if the illness, claimed as a basis for the deferment, existed or was reasonably foreseeable at the time of entry on active duty. The regulation thus admits of some flexibility, thereby making all the more significant the failure to make recommendations at the various levels of consideration and to assign reasons for a recommendation of disapproval.
 
 
 34
 Moreover, Major Bluth's son had not experienced health problems at the time his father committed himself under the "Berry Plan." It is true that Major Bluth did not enter onto active duty until three years later; but in argument, we were told that had Major Bluth withdrawn from the "Berry Plan" at the time of his son's first illness, he would have then been drafted into the military. In that event, Chapter 3 of AR 614-30, permitting temporary deferments, would have been no less available to him were he ordered to Vietnam. We are impressed with the illogic of saying that, under these circumstances, Major Bluth should be denied the opportunity to resort to Chapter 3 when he has been fulfilling his commitment under the "Berry Plan," and the Army has availed itself of the medical expertise that he has provided.
 
 V
 
 35
 Because of the conclusions we have reached, we express no view on the other asserted errors.
 
 
 36
 The judgment of the district court is reversed, and the case remanded for entry of an order in accordance with this opinion granting the relief prayed.
 
 
 37
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 In the briefs filed with this court and at oral argument, counsel for both parties indicated some doubt as to whether Major Bluth's request should properly have been filed under AR 614-30 or under AR 614-6, the latter dealing with "Permanent Change of Station and Reassignment Policy." In fact, counsels' argument was framed in the alternative, based on the assumption that either regulation was applicable to Major Bluth's request. The district court concluded that AR 614-6 was applicable and decided the case on that basis. However, on examination of AR 614-6, we note that § 3 of this regulation defines "change of assignment" and "permanent change of station" in terms of either a reassignment within the individual's present station or a change of station involving reimbursible traveling expenses. Since Major Bluth is requesting neither a change of duty at Fort Belvoir nor a change of geographical location, it seems clear that the only applible regulation is AR 614-30, notwithstanding the contrary conclusion of the district court
 In the light of this conclusion, we need not consider Major Bluth's additional contention that the Compassionate Reassignment Review Board, created by Memorandum No. 614-103, dated December, 1966, of The Surgeon General, Department of the Army, was improperly constituted under AR 614-6(22) (b) (1) which requires that if "medical problems" are the basis for a reassignment request, "the evidence supporting the request will be referred to military surgeons for evaluation and recommendations" when the Board consisted of a dentist, a nurse and a physician, as the memorandum permitted.
 
 
 [2]
 Major Bluth's original application stated the reasons for the inability of these family members to help with the care of the child. In each instance, an affidavit of an attending physician supported his statements. His wife has individual problems of a psychiatric nature and two other children to care for. His mother has a serious heart condition and was not even told of her son's imminent departure for fear of the effect on her. His wife's mother must spend all her time caring for her husband, a semi-invalid suffering from advanced rheumatoid arthritis and who suffered a heart attack which necessitated the surgical insertion of a permanent cardiac pacemaker
 
 
 [3]
 The letters "POR" are not defined in the regulation. Three post-argument inquiries of government counsel about what they abbreviate have not successfully elicited a definitive answer, although it is reported that they mean, in substance, "preparation of individual replacments for overseas movement." In any event, the government makes no claim that Major Bluth failed to fulfill this requirement, although other possible deficiencies are argued
 
 
 [4]
 It is true that this section does not expressly apply to all applications except those which obviously do not warrant approval. The language used is "[a]pplications warranting favorable consideration * * *." However, as these are the only two sections dealing with the procedure for processing applications, the only reasonable interpretation is that § 3-4(a) applies unless "circumstances obviously do not justify approval" within the meaning of § 3-4(b). In any event, Major Bluth's application was not summarily denied by his intermediary commander but was forwarded to the Adjutant General