**John C. O'MARA, Appellant,**

v.

**Captain William ZEBROWSKI, U.S.A.R., Commanding Officer and the Honorable Stanley Resor, Secretary of the Army.**

**No. 19288.**

United States Court of Appeals, Third Circuit.

Argued April 5, 1971.

Decided Aug. 10, 1971.

John David Egnal, Egnal & Egnal, Philadelphia, Pa., for appellant.

Barry W. Kerchner, Asst. U. S. Atty., (Louis C. Bechtle, Philadelphia, Pa., on the brief), for appellees.

Before GANEY, VAN DUSEN and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Appellant, John C. O'Mara, a member of the United States Army Reserve, filed the instant action to obtain relief from a Department of the Army order of March 5, 1970, directing him to perform 18 months and 25 days of active duty in the United States Army. O'Mara appeals from an August 11, 1970, order of the district court dismissing his complaint, after a hearing, for failure to state a claim upon which relief can be granted. *See* O'Mara v. Zebrowski, 315 F.Supp. 1195 (E.D.Pa.1970).

In June 1969, during the course of a regularly scheduled physical examination prior to his unit's summer encampment,

O'Mara was referred to the United States Army Hospital at Valley Forge for an evaluation of his physical condition. At Valley Forge high blood pressure was diagnosed and, as a result, O'Mara returned to his summer encampment but spent his entire encampment period confined to the barracks area on a no-duty status for medical reasons. After O'Mara's unit returned from summer encampment, the Army continued its medical evaluation of O'Mara in order to determine his fitness for retention in the Army Reserves. This continuing medical evaluation generated the present controversy.

Five unexcused absences from drill ("unit training assemblies") accumulated during a one-year period constitute failure to participate satisfactorily in the Army Ready Reserve. A member of the Army Ready Reserve who fails to participate satisfactorily in this respect will be ordered to active duty for a period which, when added to his prior service on active duty, will total 24 months. Army Reg. 135–91(12); 10 U.S.C. § 673a (Supp. V, 1969). Prior to requesting that a member who fails to participate satisfactorily be ordered to active duty, the unit commander must determine if "any cogent or emergency reasons existed which prevented the member from attending" the drill which resulted in an accrual of a total of five or more unexcused absences in a one-year period. Army Reg. 135–91(e) (2).

The record is not entirely clear with respect to how many unit training assemblies O'Mara missed. It appears that, during a one-year period commencing prior to the summer encampment of July 1969 and extending to October 7, 1969, O'Mara accumulated at least 19 unexcused absences from unit training assemblies.[1] Throughout this period

---

1. On October 7, 1969, Captain Zebrowski, O'Mara's unit commander, notified O'Mara that he would recommend that O'Mara be ordered to active duty unless O'Mara presented some cogent reason for delay. Captain Zebrowski's letter advised O'Mara that he had accumulated

29 unexcused absences from unit training assemblies during a one-year period. The dates of the unexcused absences indicate, however, that only 19 had occurred within the twelve-month period prior to the last unexcused absence.

O'Mara received by certified mail numerous warnings regarding his failure to participate satisfactorily. On October 7, 1969, Captain Zebrowski, O'Mara's unit commander, notified O'Mara that he would recommend within 10 days that O'Mara be ordered to active duty training unless O'Mara presented some cogent reason for delay. When O'Mara failed to respond, Captain Zebrowski recommended that O'Mara be ordered to active duty training. On November 19, 1969, Headquarters, First United States Army, returned the recommendation for involuntary active duty without action, and directed that O'Mara not be charged with the accumulated unexcused absences since the warning letters that had been sent to him were an obsolete form. Prior to the time that this letter was received by Captain Zebrowski, O'Mara accumulated four unexcused absences in November 1969. A proper warning letter was sent to O'Mara. In December 1969, O'Mara accumulated two more unexcused absences, once more pushing the total past the requisite five. Again, a proper warning letter was sent to O'Mara. On January 13, 1970, Captain Zebrowski sent O'Mara a letter advising him that a request to have O'Mara ordered to active duty had been initiated as a result of five or more unexcused absences. On February 25, 1970, Headquarters, First United States Army, sent O'Mara a letter advising him that active duty orders would be issued in approximately 30 days. That letter provided that "In the event you wish to contest your order to active duty by requesting a delay or relief from call to active duty, you must immediately present a written request *with documentation* through your unit commander" (emphasis added). After receiving this letter, O'Mara took an appeal by submitting to his unit commander a written statement of his understanding of why and how he had been relieved of his obligation to attend unit training assemblies. The unit commander forwarded that letter to the area commander, the intermediate level in the appeal process. The area commander viewed O'Mara's explanation as inadequate, and recommended that the Delay Appeal Board deny the appeal. The Delay Appeal Board denied the appeal,[2] and this suit for injunctive relief against the order to active duty followed.

■■ It is a well established principle that the federal courts will not review discretionary decisions of the military authorities made within their valid jurisdiction.[3] This does not mean that military orders are insulated from claims that they were promulgated in violation of the military's own regulations,[4] but O'Mara does not claim that in promulgating his activation order the Army violated its own regulations or the procedures that those regulations mandate.[5] Instead, O'Mara con-

---

2. *See* note 10, *infra.*

3. *See, e. g.,* Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); Bluth v. Laird, 435 F.2d 1065 (4th Cir. 1970); Byrne v. Resor, 412 F.2d 774 (3rd Cir. 1969); Smith v. Resor, 406 F.2d 141 (2nd Cir. 1969); United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371 (2nd Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969); Fox v. Brown, 402 F.2d 837 (2nd Cir. 1968), cert. denied, 394 U.S. 938, 89 S.Ct. 1219, 22 L.Ed.2d 471 (1969); Morse v. Boswell, 289 F. Supp. 812 (D.Md.), aff'd, 401 F.2d 544 (4th Cir. 1968), cert. denied, 393 U.S. 1052, 89 S.Ct. 687, 21 L.Ed.2d 694 (1969); Winters v. United States, 281

F.Supp. 289 (E.D.N.Y.), aff'd, 390 F.2d 879 (2nd Cir.), cert. denied, 393 U.S. 896, 89 S.Ct. 188, 21 L.Ed.2d 177 (1968).

4. *See, e. g.,* Bluth v. Laird, 435 F.2d 1065 (4th Cir. 1970); Smith v. Resor, 406 F.2d 141 (2nd Cir. 1969).

5. O'Mara suggests, for the first time, in his reply brief filed in this court, that Army Reg. 15-6 is applicable to involuntary activation of reservists, and that the procedures mandated by that regulation were not followed in this case. Since this issue was not raised in the district court (see notes of testimony of July 23, 1970, and plaintiff's brief sur motion for preliminary injunction filed July 29, 1970), it will not be considered on this appeal. The district court found that the military

tends that Army Reg. 135–91, which governed the involuntary activation of O'Mara, is constitutionally insufficient for failure to meet minimum standards of due process of law required by the fifth amendment. We believe that a federal court has jurisdiction to review procedures employed by the military to determine if they comport with the requirements of procedural due process in light of the context in which the procedures operate. Brown v. McNamara, 387 F.2d 150, 152 (3rd Cir.1967).

Army Reg. 135–91 "prescribes policies, procedures, and responsibilities pertaining to satisfactory completion of the Ready Reserve service obligation and enforcement procedures pertaining thereto for certain enlisted male personnel of the Reserve components." [6] It prescribes that those reservists who "fail to attend prescribed unit training without proper authority or who, because of change in residence, job interference or other reasons, are unable to continue serving in a unit, will be ordered to active duty. * * *" [7] As noted above, before requesting that a reservist who fails to attend prescribed unit training be ordered to active duty, the unit commander will "determine if any cogent or emergency reasons existed which prevented the member from attending. If no such reasons existed, he will * * * [request] that [the member] be ordered to active duty * * * [and] will then immediately notify the member of the action he has taken. * * *" [8] The regulation also permits appeals from involuntary orders to active duty. [9] The appeal procedure is not set out with crystal clarity in the regulation, but it appears that appeals are directed first to the area commander and then, if denied, are automatically forwarded for further consideration to the Commanding Officer, United States Army Reserve Components Personnel Center, Fort Benjamin Harrison, Indiana. [10]

O'Mara contends, specifically, that this procedure is unconstitutional for failure to meet minimum standards of due process because it fails to require a hearing prior to the unit commander's determination that a reservist has performed unsatisfactorily and his resultant request that the reservist be ordered to active duty, because it fails to require that the reservist be given a copy of the recommendation of the area commander that accompanies the appeal from the intermediate level to the final appellate authority at Fort Benjamin Harrison,

authorities followed the procedures of Army Reg. 135–91 in activating O'Mara, and O'Mara does not contend that this finding is clearly erroneous.

6. Army Reg. 135–91(1).

7. Army Reg. 135–91(5) (b).

8. Army Reg. 135–91(12) (e) (2).

9. Army Reg. 135–91(20) (d). Army Reg. 601–25 also provides a procedure for seeking an exemption from an involuntary order to active duty. See Army Reg. 601–25(1–2a), (1–7b), (3–1a).

10. See Army Reg. 135–91(20). It is difficult to discover from reading Army Regs. 135–91 and 601–25 the precise procedure that is prescribed for appeals from involuntary orders to active duty. The parties have not contended that other regulations are applicable. O'Mara's appeal was considered and denied first by a reviewing officer, who acted on behalf of the commanding officer, Headquarters, First United States Army, and who then forwarded the appeal papers together with his recommendation that the appeal be "disapproved" to the Commanding Officer, United States Army Reserve Components Personnel Center, Fort Benjamin Harrison, Indiana. At Fort Benjamin Harrison, O'Mara's appeal was considered by a "AR 135–91 Delay Appeal Board," which unanimously recommended disapproval of the appeal. The acting commanding officer accepted this recommendation and denied O'Mara's appeal. Since O'Mara objects to the undisputed absence of certain procedural safeguards, we do not think it worthwhile to go into further detail regarding the procedure followed in this case.

and because it fails to provide a right to counsel.[11]

The absence of these safeguards must be considered in light of the factual context of this case, for "[a] procedural rule that may satisfy due process in one context may not necessarily satisfy procedural due process in every case." Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (U. S., May 24, 1971). We start from the proposition urged upon us by the Government that "[t]o those in the military or naval service of the United States the military law is due process." Reaves v. Ainsworth, 219 U.S. 296, 304, 31 S.Ct. 230, 233, 55 L.Ed. 225 (1911). That statement of the Supreme Court might appear to end our inquiry here, but, in the 60 years since *Reaves* was decided, the Court has expanded considerably the requirements of the somewhat vague and elastic concept "due process of law." Throughout the same period, however, the Court has fairly consistently adhered to the concept that the civilian courts are to inject themselves into the internal operations of the military only in extraordinary circumstances,[12] and this consideration is pertinent when federal courts are asked effectively to rewrite the military's internal procedures.

Involuntary activation, of course, has a substantial impact upon the reservist activated. Although O'Mara seeks to characterize involuntary activation as "punishment," and thereby magnify its impact upon him, this characterization does not fit well, for involuntary activation befalls reservists who fail or are unable to attend unit training assemblies because of a change in residence or job interference, as well as those who fail to attend without proper authority.[13] Rather, the primary purpose of involuntary activation appears to be to maintain the military proficiency that is otherwise maintained by attendance at unit training assemblies.

Persons in the military do not enjoy the full range of rights enjoyed by civilians,[14] and, in addition, voluntary enlisted reservists, like O'Mara, are a class distinct from inducted servicemen.[15] They voluntarily subject themselves to the jurisdiction of the Army, and when they enlist, they are apprised of the consequences of failure to participate satisfactorily in unit training assemblies.[16] This orientation, which must be repeated at least once annually for each enlisted reservist,[17] includes having each enlisted reservist sign a statement acknowledging that "he has been oriented on and understands the satisfactory participation requirements and enforcement provisions." [18] In relevant part, the statement signed by O'Mara provides:

"I understand that absences from scheduled unit training assemblies

11. O'Mara also contends that the procedure is constitutionally deficient because "the initial adverse determination [by the unit commander] is made ex parte, without the necessity of any investigation." As we have noted, there is a requirement that the unit commander "determine if any cogent or emergency reasons existed which prevented the member from attending." Army Reg. 135–91(12) (e), (2). It thus appears that some inquiry is required, and this record demonstrates repeated efforts by the unit commander to get an appropriate explanation from O'Mara for his absences.

12. *See, e. g.*, Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958); Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1952).

13. Army Reg. 135–91(5) (b). It is difficult to believe that the Army has a consistent policy of "punishing" reservists who are unable to attend unit training assemblies because they move outside the area in which their unit is located.

14. Raderman v. Kaine, 411 F.2d 1102, 1104 (2nd Cir.), petition for cert. dismissed, 396 U.S. 976, 90 S.Ct. 467, 24 L.Ed.2d 447 (1969).

15. Brown v. McNamara, 387 F.2d 150, 152 (3rd Cir. 1967).

16. Army Reg. 135–91(13).

17. Army Reg. 135–91(13) (a).

18. Army Reg. 135–91(13) (b).

\* \* \* may be authorized *by the Unit Commander* for reasons of sickness, injury, emergency, or other circumstances beyond my control *when substantiated by affidavits or certified by a doctor or medical officer.*

\* \* \* \* \* \*

"Requests for authorized absence must be submitted *in writing* in advance unless illness or emergency does not provide sufficient time for submission, in which case, it must be submitted at the earliest practicable date."

[Emphasis added.]

It is clear on this record that O'Mara did not provide any written documents contemplated by this statement until after his unit commander requested his activation for the second time, and the letter than submitted by O'Mara was forwarded to the area commander.

■ The procedure of Army Reg. 135–91 unquestionably could be improved. Determinations of a rather summary character which substantially affect individuals are, however, an everyday occurrence in the military. It is not our function to decide what is best for enlisted reservists. The challenged procedure does permit a reservist to take the matter up with his unit commander, and it also permits an appeal in which the reservist has an opportunity to "explain those facts pertinent to his case which he feels were not fully considered, and \* \* \* include any addi-

tional appropriate evidence. \* \* \*" Army Reg. 135–91(20) (a).[19] Given the factual context in which this procedure operates, and the presumption of constitutionality that attaches to this statutorily authorized[20] procedure, we are unable to conclude that the procedure is constitutionally defective.

■ O'Mara also contends that 10 U. S.C. § 673a (Supp. V, 1969), the statutory basis for his involuntary activation, is qualified or modified by 10 U.S.C. § 886(1) (1964) and/or 10 U.S.C. § 815 (1964). These statutes were enacted prior to 10 U.S.C. § 673a (Supp. V, 1969), which begins with the unequivocal language "Notwithstanding any other provision of law." We therefore reject this contention.[21]

■ O'Mara further contends that involuntarily activated reservists should be subjected to the medical standards for induction, rather than the medical standards for retention.[22] Since it is not clear at this point in time which standards the Army will apply to O'Mara,[23] and since it is not clear whether O'Mara would be found acceptable under either or both standards or unacceptable under either or both standards,[24] we do not believe that this issue is ripe for adjudication. Insofar as O'Mara's contention is based on 50 U.S.C. App. § 456(c) (2) (D) (1964), we think that it has been authoritatively resolved against him by Fox v. Brown, 402 F.2d 837 (2nd Cir. 1968), cert. denied, 394 U.S. 938, 89 S. Ct. 1219, 22 L.Ed.2d 471 (1969).

19. *See* note 10, *supra.*

20. It seems clear that 10 U.S.C. § 673a (Supp. V, 1969) contemplates that an appropriate procedure be devised to implement that section.

21. *See also* Fox v. Brown, 402 F.2d 837 (2nd Cir. 1968), cert. denied, 394 U.S. 938, 89 S.Ct. 1219, 22 L.Ed.2d 471 (1969).

22. Reservists ordered to active duty are required to undergo a prescribed medical examination. Army Reg. 135–91(15).

23. Army Reg. 135–91(15) states that a reservist's fitness for active duty will be determined in accordance with the standards of medical fitness prescribed in Army Reg. 40–501, but it does not specify whether the induction standards or the retention standards, both of which are contained in Army Reg. 40–501, are applicable. The parties have offered us no clarification regarding which standards are applicable.

24. O'Mara's alleged disability is non-permanent in character.

We have considered the other contentions advanced by O'Mara[25] and find them without merit.

For the reasons stated above, the August 20, 1970, injunction pending appeal will be vacated, and the August 11, 1970, district court order[26] will be affirmed.

25. O'Mara contends for the first time on this appeal that his involuntary activation is cruel and unusual punishment which violates rights secured to him by the eighth amendment. Inasmuch as this issue was not raised in the district court (see notes of testimony of July 23, 1970, and plaintiff's brief sur motion for preliminary injunction, filed July 29, 1970), it will not be considered on this appeal.

26. Since evidence (testimony and exhibits) was received at the hearing, this order is similar to one under F.R.Civ.P. 41(b), 52, or 56.