Leicester F. CARUSO,

v.

Cpt. James S. TOOTHAKER, Commanding Officer, Headquarters Detachment, Pa. Army National Guard,

and

Secretary of Defense, The Pentagon, Washington, D. C.

Civ. No. 71-301.

United States District Court, M. D. Pennsylvania.

Sept. 3, 1971.

Egnal & Egnal, Philadelphia, Pa., J. Thomas Menaker, Harrisburg, Pa., for plaintiff.

S. John Cottone, U. S. Atty., Scranton, Pa., for defendants.

## OPINION

MUIR, District Judge.

Leicester F. Caruso, a private in the Army National Guard, brings this suit seeking injunctive relief from an order of the Department of the Army directing him to report for active duty in the United States Army for 18 months and 17 days. Jurisdiction is predicated upon 28 U.S.C. §§ 1331 and 1361. After a hearing and argument, we deny the application for a preliminary injunction.

10 U.S.C. § 673a [1] confers authority on the President to order to active duty any

---

1. "§ 673a. Ready Reserve: members not assigned to, or participating satisfactorily in, units

(a) Notwithstanding any other provision of law, the President may order to

member of the Ready Reserve of an armed force who is not "participating satisfactorily" in a unit of the Ready Reserve, has not fulfilled his statutory reserve obligation and has not served in active duty for a total of 24 months. By Executive Order No. 11366, the President delegated this authority to the Secretary of Defense, together with authority to delegate this power in turn to any of the secretaries of the military departments of the Department of Defense.

Criteria for satisfactory participation are set forth in Army Regulation 135-91 (12) which provides:

"A member fails to participate satisfactorily when he accrues in any 1-year period a total of five or more unexcused absences from scheduled unit training assemblies. * * *"

AR 135-91(5) (d) provides:

"Satisfactory participation is defined as follows:

(1) * * *

(2) Attendance at all scheduled unit training assemblies as a member of a paid drill unit of the Army National Guard or Army Reserve, unless excused by proper authority as provided herein. A member present at a scheduled unit training assembly will not receive credit for attendance thereat unless he is in the prescribed uniform, presents a neat and soldierly appearance, and performs his assigned duties in a satis-

factory manner as determined by the unit commander. When a member attends a unit training assembly and does not receive credit therefor, he will be charged with an unexcused absence and the unit commander will follow the same procedures applicable when a member fails to attend a unit training assembly."

Caruso accumulated five unexcused absences from unit training assemblies within a year and has been ordered to report for active duty. After appealing through the appropriate Army channels, he brought this suit to obtain judicial review of the Army procedures and determinations resulting in that order.

■ It is well-settled that purely discretionary decisions of military officials within their valid jurisdiction are beyond the permissible scope of review of the Federal Courts.[2] Nevertheless, the allowable scope of review extends to the questions (1) whether military orders were "promulgated in violation of the military's own regulation", O'Mara v. Zebrowski, 447 F.2d 1085 (No. 19,288, 3d Cir., 1971), (2) whether procedures employed by the military comport with the requirements of due process in light of the context in which the procedures operate, O'Mara v. Zebrowski, supra (at p. ——), Ansted v. Resor, 437 F.2d 1020, 1023-1024 (7th Cir. 1971); Crotty v. Kelly, 443 F.2d 214 (1st Cir. 1971), and (3) whether or not the military has acted within the jurisdiction conferred on it by

active duty any member of the Ready Reserve of an armed force who—

(1) is not assigned to, or participating satisfactorily in, a unit of the Ready Reserve;

(2) has not fulfilled his statutory reserve obligation; and

(3) has not served on active duty for a total of 24 months.

(b) A member who is ordered to active duty under this section may be required to serve on active duty until his total service on active duty equals 24 months. If his enlistment or other period of military service would expire before he has served the required period under this section, it may be extended until he has served the required period.

(c) To achieve fair treatment among members of the Ready Reserve who are being considered for active duty under this section, appropriate consideration shall be given to—

(1) family responsibilities; and

(2) employment necessary to maintain the national health, safety, or interest.

Added Pub.L. 90-40, § 6(1), June 30, 1967, 81 Stat. 105."

2. Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); O'Mara v. Zebrowski, 447 F.2d 1085 (No. 19,288, 3d Cir. 1971).

valid law. Winters v. United States, 281 F.Supp. 289, (E.D.N.Y.1968) aff'd 390 F.2d 879 (2d Cir. 1968).

Caruso received his first two unexcused absences when he did not appear for either of the two drill periods scheduled for Sunday, October 11, 1970. After an abnormally extended first pregnancy, plaintiff's wife went into labor on Thursday, October 8 and gave birth at 10:00 A.M. Saturday, October 10. At some time prior to the scheduled morning drill period on October 10, Caruso reached a Sergeant Hall at the National Guard Headquarters Detachment in Harrisburg and obtained oral permission to be absent from both morning and afternoon drill periods on October 10. No mention was made during this telephone conversation of permission to be absent from the October 11 drill periods. Caruso testified that he believed that since the same reasons for his absences on Saturday still existed on Sunday, it was unnecessary to obtain additional permission for the Sunday absences.

Caruso received his third and fourth unexcused absences on May 15, 1971, when he failed to appear for two drill periods. He had scheduled an appointment with an insurance client for the morning of Saturday, May 15, but had been denied [3] permission to be absent and to make up the absence by "equivalent training." [4] He was informed that he would receive unexcused absences if he did not appear for the scheduled drill periods, but he elected to take the unexcused absences.

Caruso received his fifth unexcused absence the following day, May 16, 1971. His unit commander, Captain James S. Toothaker, assigned three reasons for his decision to withhold credit for attendance.

(1) Caruso arrived 45 minutes late for the unit training assembly; instead of reporting directly to a superior officer upon late arrival, he went to his scheduled class;

(2) During the two-hour MOS (Military Occupational Skill) class, Caruso was observed working with materials relating to his insurance business instead of devoting his complete attention to the subject matter of the class; and

(3) At 11:00, Caruso signed out to attend a church service, but instead of attending church he drove to his home where he watched his child while his wife went to church.

For these reasons Captain Toothaker determined [5] that Caruso's participation in the morning session of May 16, 1971, was unsatisfactory.

Caruso alleges seven defects in the procedures employed by the Army in his case.

1. FAILURE OF UNIT COMMANDER TO MAKE PROPER DETERMINATION. Plaintiff contends that Captain Toothaker failed to make a proper determination whether "any cogent or emergency reasons existed which prevented the member from attending"

---

3. AR 135–91(9) "Excused Absences", provides in part:
"* * * Commanders should make judicious use of their authority to excuse members and to authorize equivalent training in cases where employers have scheduled career training of several weeks duration which will preclude attendance at unit training assemblies. With the concurrence of the commander concerned, a member may be attached to another ARNG or USAR unit for the purpose of such training. *Employment conflicts, overtime, schooling, and loss of income are not normally*

considered *valid reasons for absences from training. * * *"* (Emphasis supplied.)

4. Cf. AR 135–91(10).

5. AR 135–91(5) (d) provides, in part:
"* * * A member present at a scheduled unit training assembly will not receive credit for attendance thereat unless he is in the prescribed uniform, presents a neat and soldierly appearance, and *performs his assigned duties in a satisfactory manner as determined by the unit commander. * * *"* (Emphasis supplied.)

as required by AR 135–91(e) (2) [6]. This contention is without merit. During the afternoon training session on May 16, Captain Toothaker called Private Caruso to his office and asked him whether he had, in fact, attended church during the morning session. Caruso admitted that he had not attended church and stated he disliked the National Guard and he would take advantage of every opportunity he saw to leave for an hour. He did not explain why he failed to attend a church service.[7] Captain Toothaker then listed the three reasons for which he found Caruso's participation in the morning session unsatisfactory and asked him whether there were any facts he should be aware of before deciding whether to deny credit for the morning session. Caruso made no attempt to refute [8] these charges; he offered no excuse for being late or for attending to his insurance business during the MOS class.

▪ Under the circumstances, it is impossible to conclude that Captain Toothaker failed to make the requisite determination [9]. Plaintiff argues that

6. AR 135–91(12) (e) (2) provides: "If the absence(s) charged will result in a total accrual of five or more unexcused absences in a 1-year period, determine if any cogent or emergency reasons existed which prevented the member from attending. If no such reasons existed, he will forward the member's Military Personnel Records Jacket to the appropriate area commander or State adjutant general requesting that he be ordered to active duty as prescribed in a above. * * *"

7. Caruso testified in the instant case that he left the National Guard meeting intending to attend a church service with his wife and child, but that when he arrived at his home he learned his son was asleep. Since it was not the parents' practice to wake the child, he offered to care for the child while his wife attended church services; he explained that church services were more meaningful to his wife than to him. According to his own testimony, he made no attempt to advise his superior officers of this change of plan.

8. In the hearing on the preliminary injunction, plaintiff admitted that he was late

AR 135–91(12) (e) (2) obligated Captain Toothaker to make a determination whether "any cogent or emergency reasons existed" for his third and fourth absences, as well as for the critical fifth absence. Even if AR 135–91(12) (e) (2) were capable of the construction plaintiff urges, plaintiff was not harmed by Captain Toothaker's alleged failure to make such a determination. That there were no "cogent or emergency reasons" [10] for Private Caruso's absences on May 15 is plain from his own testimony that he had scheduled a conference with an insurance client and elected to take the unexcused absences instead of breaking the appointment. Moreover, AR 135–91(12) (e) (2) requires no such determinations. The regulation provides:

"(e) * * * the unit commander will * * * (2) If the *absence(s)* charged will result in a total of five or more unexcused absences in a 1-year period, determine if any cogent or emergency reasons existed which prevented the member from attending." [11]

(Emphasis supplied).

and that he had "client cards" relating to his insurance business on his desk during the MOS class, but asserted, nevertheless, that he was paying attention during the lecture.

9. AR 135–91(12) (e) (2) requires the unit commander to "determine if any cogent or emergency reasons existed *which prevented the member from attending*". It is arguable that no such determination is required where, as here, the member was *present* but his participation was unsatisfactory. However, assuming, without deciding, that AR 135–91(12) (e) (2) requires a determination in the latter case, it would appear this requirement is met by a determination that no "cogent or emergency reasons existed" for the member's unsatisfactory participation.

10. Relevantly, AR 135–91(9) (a) provides: " * * * Employment conflicts, overtime, schooling, and loss of income are not normally considered valid reasons for absences from training. * * *"

11. It might be inferred from the parenthetical 's' following 'absence' in (12) (e) (2) that the requisite determination involves an inquiry into the circumstances

It would appear that the (12) (e) (2) inquiry is required where (a) a member accrues a single unexcused absence, which is his fifth absence in the one-year period, (b) a member accrues in one transaction more than one unexcused absence, the last of which is his fifth [12] or (c) a member accrues in one transaction more than one unexcused absence, the first of which is his fifth absence [13]. Under this construction, Caruso was entitled to no more than he received.

### ■ 2. EQUIVALENT TRAINING.

Plaintiff argues that his unit commander violated Army regulations governing equivalent training [14] by denying him permission to make up his absences by "equivalent training" (ET). AR 135–91(9) [15] makes it clear that the grant of equivalent training is discretionary with the unit commander. As noted above [16],

the scope of review in Federal Courts does not extend to the review of the exercise of valid discretion by military officials.

### ■ 3. APPLICABILITY OF AR 135–91.

Plaintiff argues that AR 135–91 is inapplicable where, as in the case of his fifth absence, the reservist is physically present for the unit training assembly. This argument is without merit. Gianatasio v. Whyte, 426 F.2d 908 (2d Cir. 1970); Byrne v. Resor, 412 F.2d 774 (3d Cir. 1969). Any doubt concerning this point is dispelled by AR 135–91, itself; AR 135–91(5) (d) (2) provides:

"A member present at a scheduled unit training assembly will not receive credit for attendance thereat unless he is in the prescribed uniform, presents a neat and soldierly appearance, and

surrounding the first four absences as well as the fifth, but that construction is implausible. Had the draftsman of AR 135–91(12) (e) (2) intended such an implication that end could easily have been achieved by substituting 'absences' for 'absence(s)'.

12. E. g. Two unexcused absences, the member's fourth and fifth, are accrued as a result of failure to attend the morning and afternoon sessions of a unit training assembly. Under this construction, the (12 (e) (2) inquiry would be required for *both* absences #4 and #5.

13. E. g. The member misses the morning and afternoon sessions of a scheduled unit training assembly and, thereby, accrues his fifth and sixth unexcused absences. Under this construction, the Unit Commander would be obligated to determine "if any cogent or emergency reasons existed" for either the fifth or sixth absence.

14. AR 135–91(10) provides: "*Equivalent training*: This regulation does not change the policies and procedures pertaining to equivalent training as authorized in NGR 45 and AR 140–1." Plaintiff has not made either of these regulations available to the court and does not press this argument.

15. "9. *Excused absences.* * *a.* Absences from scheduled unit training assemblies or annual training *may be authorized* by

the unit commander for reasons of sickness, injury, emergency, or other circumstances beyond the control of the member and substantiated by appropriate affidavits or certified by a doctor or medical officer, provided such documents are received within 14 days of the absence. Commanders should make *judicious use of their authority* to excuse members and to authorize equivalent training in cases where employers have scheduled career training of several weeks duration which will preclude attendance at unit training assemblies. With the concurrence of the commander concerned, a member may be attached to another ARNG or USAR unit for the purpose of such training. Employment conflicts, overtime, schooling, and loss of income are not normally considered valid reasons for absences from training. Hardship cases which result from application of the foregoing will be referred to area commander or State adjutant general, as appropriate, for review and final decision. Members will be required to participate pending decision by the appropriate commander. DA Pamphlet 135–2 contains procedures to be followed by members in notifying employers of training requirements." (Emphasis supplied.)
It would appear that the reason for Caruso's third and fourth absences would fall into the categories of "employment conflicts" or "loss of income" for which equivalent training is inappropriate.

16. See n. 2, supra.

*performs his assigned duties in a satisfactory manner as determined by the unit commander. When a member attends a unit training assembly and does not receive credit therefor, he will be charged with an unexcused absence and the unit commander will follow the same procedures applicable when a member fails to attend a unit training assembly"*. (Emphasis supplied.)

Plaintiff's next contentions pertain to the procedures for appeal [17] within the Army of his unit commander's determination that Caruso had accumulated five

unexcused absences and his request for issuance of orders.

4. RIGHT TO APPEAL RECORD. Relying on principles enunciated in Gonzales v. United States, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955) and Crotty v. Kelly, 443 F.2d 214, (1st Cir. 1971), Caruso argues that the Army's failure or refusal to provide him with a copy of the contents of the file reviewed by the Delay Appeal Board in his case, including, in particular, a copy of the recommendation of the State Adjutant General to the Appeal Board, reaches constitutional dimensions, and that he was there-

17. Cf. AR 135–91(12), AR 135–91(16) and AR 135–91(20). AR 135–91(20) provides:

"20. *Appeals. a. General.* An individual who has been denied a requested discharge or delay in order to active duty may appeal such denial. The appeal will be submitted within 15 days of the member's receipt of a denial; it will explain those facts pertinent to his case which he feels were not fully considered, and may include any additional appropriate evidence which the applicant may wish to present.

* (1) In those instances where the reporting date shown in active duty orders does not permit sufficient time to allow the member to submit an appeal and for a final decision to be furnished, orders may be amended to reflect a later reporting date or orders may be revoked and new orders published when availability date is determined.

* (2) Action to amend or revoke active duty orders as set forth in (1) above should not be construed as an act of granting formal delay in entry on active duty as authorized in paragraph 16c. Paragraph 16d is not applicable to members whose active duty orders have been amended or revoked to permit processing of an appeal request.

*b. How submitted.* Requests for appeals will be submitted through the unit commander to the commander having authority to approve discharges or delays as prescribed in paragraphs 16a and 19a as appropriate.

*c. Authority to act on appeals.* The approving authority may act on such appeals when the decisions are favorable to the individual concerned. When denial of an appeal is indicated, however, he will forward the request and pertinent

records, together with his recommendations, to Headquarters, Department of the Army for final determination as follows:

(1) * * *

(2) *Denial of appeal for delay.*

(a) State adjutants general will forward denial of appeals for delay to the Commanding Officer, U.S. Army Reserve Components Personnel Center, Fort Benjamin Harrison, IN 46249, through Chief, National Guard Bureau, Department of the Army, Washington, D.C. 20310 for processing under AR 601–25.

* (b) Area commanders and CG, USAAC, will forward denial of appeals for delay to the Commanding Officer, U.S. Army Reserve Components Personnel Center, Fort Benjamin Harrison, IN 46249 for processing under AR 601–25.

*d. Appeal of involuntary order to active duty.* If an individual appeals his involuntary order to active duty for reasons other than those specified in this regulation, the denial of such appeal will be forwarded to CO, USARCPC in accordance with c(2) (a) or (b) above as appropriate. The member's DA Form 201 (Military Personnel Records Jacket, U.S. Army) will be forwarded in all appeal cases.

* *e. Appeal board.* The Commanding Officer, U.S. Army Reserve Components Personnel Center, will convene an appeal board to determine findings and submit recommendations to him on denials of appeal of involuntary order to active duty submitted under this regulation. The board proceedings will be as prescribed by the Commanding Officer, U.S. Army Reserve Components Personnel Center. The provisions of AR 15–6 will not be applicable to such proceedings.

by prejudiced [18] in that he was unable to answer the charges of being absent without excuse on October 11, 1970 and May 15, 1971. AR 135–91(16) (a) provides: "State adjutants general and area commanders for unit personnel and CO, USAAC, for nonunit personnel and members of USAAC (USAR Augmentation) are authorized to take final action on requests for initial delay. * * *" Applications for delay of issuance of orders to report to active duty are submitted first to the unit commander "who will forward them together with his recommendations to the headquarters authorized to take final action." AR 135–91 (16) (b). When the State adjutant general or area commander denies a member's appeal from his unit commander's adverse decision on an application for delay, the regulations require [19] him to "forward the request and pertinent records, together with his recommendations, to Headquarters, Department of the Army" for final determination by an appeal board convened by the Commanding Officer, U. S. Army Reserve Components Personnel Center, Fort Benjamin Harrison, Indiana, pursuant to AR 135–91(20) (e).

█ In O'Mara v. Zebrowski, supra, the Court of Appeals for this circuit sustained the constitutionality of Army procedures relating to involuntary orders to active duty under AR 135–91 in the face of a general challenge that they do not comport with the requirements of due process. In concluding that the AR 135–91 procedures are not constitutionally defective, the court expressly passed on the failure of the procedures "to require that a reservist be given a copy of the recommendation of the area commander that accompanies the appeal from the intermediate level to the final appellate authority." [20]

█ Even if the refusal to supply a copy of the Appeal Board record amounted to a denial of due process, plaintiff is not prejudiced thereby, for the Adjutant General's recommendation contains no factual allegations in addition to those contained in Captain Toothaker's letter of May 17, 1971, to Caruso. It is impossible, therefore, to conclude that Caruso was prejudiced by ignorance of adverse factual allegations he might have refuted had he been aware of them.

5. APPEAL BOARD'S PROCEDURES. At oral argument, plaintiff abandoned his argument that the Appeal Board's procedures in his case were in violation of AR 15–6.[21]

█ 6. FORMAL HEARING BY UNIT COMMANDER. Plaintiff contends that AR 15–6 applies to the "determination" of the unit commander mandated by AR 135–91(12) (e) (2).[22] There is no support for this contention in either AR 135–91 or AR 15–6. AR 15–6 is entitled "Procedures for Investigating Officers and Boards of Officers Conducting Investigations." AR 15–6 (1) states "Investigating officers and boards of officers (which may consist of only one officer) are appointed by superior authority. * * *" It would appear that AR 135–91 does not contemplate appointment as an "investigating officer" of the unit commander by "superior authority." The unit commander's determination whether any "cogent or emergency reasons existed which prevented the member from attending" pursuant to AR 135–91(12) (e) (2) is re-

---

18. Plaintiff makes the novel argument that at the time he wrote his appeal letter he was ignorant, not of the reasons for which he received his first four unexcused absences, but of the reasons, if any, for the denial of equivalent training for his absences.

19. AR 135–91(20) (c).

20. See Slip Opinion, 447 F.2d at p. 1088.

21. AR 135–91(20) (e), dated April 8, 1971, and effective June 1, 1971, expressly provides: "* * * The provisions of AR 15–6 will not be applicable to such proceedings." Caruso appealed Captain Toothaker's determination in a letter dated June 3, 1971. The AR 135–91 Delay Appeal Board met on Private Caruso's appeal on July 7, 1971.

22. Cf. n. 9 supra.

**302**

quired as a matter of course by the regulations when a reservist receives his fifth unexcused absence; AR 135–91 requires no special order of appointment by a "superior authority" to activate the procedures leading to an involuntary order to active duty. For the reason that the procedures contemplated by AR 15–6 are inconsistent with the procedures contemplated by AR 135–91, I reject the contention that AR 15–6 applies to the unit commander's determination.

 7. CRUEL AND UNUSUAL PUNISHMENT. Finally, plaintiff argues that his involuntary order to active duty constitutes cruel and unusual punishment in violation of the Eighth Amendment. This issue was not before the Court in O'Mara v. Zebrowski, supra, but the opinion in that case intimated that the characterization of involuntary activation under AR 135–91 as "punishment" "does not fit well". The Court observed[23] : "* * * the primary purpose of involuntary activation appears to be to maintain the military proficiency that is otherwise maintained by attendance at unit training assemblies." The tests traditionally applied to determine whether a legislative enactment is punitive in nature include "whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment —retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned." Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168–169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). Judged by these criteria,—and especially in light of the "alternative purpose" noted by the Circuit Court—involuntary

activation under 135–91 is not, in my opinion, cruel and unusual punishment.

This Opinion shall constitute findings of fact and conclusions of law required by F.R.Civ.P. 52(a).