Robert S. **ANTONUK**, Petitioner-Appellant,

v.

**UNITED STATES** of America et al., Respondents-Appellees.

No. 20766.

United States Court of Appeals, Sixth Circuit.

July 8, 1971.

---

Dale Adams, Detroit, Mich., for petitioner-appellant; Green, Green & Adams, Detroit, Mich., on brief.

James W. Russell, Asst. U. S. Atty., Detroit, Mich., for respondents-appellees; Ralph B. Guy, Jr., U. S. Atty., Frederick S. Van Tiem, Asst. U. S. Atty., Detroit, Mich., on brief.

Sheldon M. Meizlish, Detroit, Mich., for American Civil Liberties Union of Michigan as amicus curiae; Erwin B. Ellmann, Chairman, Joel Shere and Sheridan Holzman, Co-Chairmen, Legal Committee, Detroit, Mich., on brief.

Before EDWARDS, CELEBREZZE, and McCREE, Circuit Judges.

McCREE, Circuit Judge.

This appeal concerns the involuntary activation of an Army reservist. Petitioner, Robert S. Antonuk, enlisted in the Army Reserve on February 4, 1965. In December 1969 he was ordered to report for active duty on January 13, 1970, pursuant to 10 U.S.C. § 673a, on the grounds that he had accumulated

more than five unexcused absences from scheduled drills during a one-year period. Antonuk claimed, and claims, that he submitted notes from an osteopathic physician in support of his requests for excuses, and that these were lost because of the Reserve unit's chaotic record-keeping. He attempted without success to appeal the determination that his service was unsatisfactory because of excessive unexcused absences. Following a congressional inquiry, the office of the Inspector General of the Army conducted an investigation and concluded that the Reserve unit's procedures were in order and that its activation of Antonuk was justified. Pending these administrative proceedings, the date on which Antonuk was required to report for active duty was extended until June 17, 1970.

Before that date, Antonuk brought this action in the United States District Court for the Eastern District of Michigan in the form of a petition for writ of habeas corpus or mandamus. The District Court granted a stay of activation, which it extended pending the outcome of appeal to this court. After examination of affidavits and other documentary evidence, and following a hearing at which appellant was represented by counsel, the District Court concluded that appellant was not entitled to the relief sought. This appeal followed. We affirm.

Appellant attacks the validity of the activation order on two grounds. His first argument, and the one stressed by amicus curiae, is that he was entitled to a due process hearing before the Army could make a decision of this magnitude affecting his future. The second is that the Army did not follow its own regulations in reaching this decision, and that accordingly its order violates due process. The second contention does not attack the constitutionality of the regulations, but, in effect, assumes arguendo that the Army could promulgate any kind of regulations establishing procedures for activation so long as they were followed.

■ This last assumption is consistent with the traditional judicial view of constitutional questions raised in a military or quasi-military (*e. g.*, Selective Service) context. Usually, in determining whether a person is entitled to certain rights in his relations with a branch of the government, courts balance the governmental interest against possible harm or detriment to the individual. *See, e. g.*, Goldberg v. Kelly, 397 U.S. 254, 260–266, 90 S.Ct. 1011, 25 L. Ed.2d 287 (1970). Here, the possible detriment to the individual is great. If the activation order is upheld, his liberty will be significantly limited by military discipline, and there is a significant risk that he might be wounded in battle or even killed. But at the same time, the governmental interest in raising an army has, without exception, been considered by the courts to be paramount. *See, e. g.*, Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946). Thus the ordinary balancing tests are rendered almost irrelevant by the transcendent importance of the war power.

■ In this context, we decline to extend the requirement of a full formal hearing to the administrative activation of an Army reservist. No decision has been cited, and our research has disclosed none, which has extended such rights so far within the military realm. On the contrary, recently decided cases have held unanimously that discretionary rulings by the Army are beyond the power of review of civilian courts. Hickey v. Secretary, 320 F.Supp. 1241 (D.Mass.1971), motion for stay denied, Misc. No. 449 (1st Cir. Jan. 19, 1971); Crotty v. Kelly, Misc. No. 448 (1st Cir. 1971), aff'g Civil Action No. 3205 (D. N.H. Jan. 12, 1971); Winters v. United States, 281 F.Supp. 289, 299 (E.D.N.Y. 1968), aff'd, 390 F.2d 879 (2d Cir. 1968); Fox v. Brown, 402 F.2d 837, 840 (2d Cir. 1968); Brown v. McNamara, 263 F.Supp. 686 (D.N.J.), aff'd in this respect, 387 F.2d 150, 152 (3d Cir. 1967); Ansted v. Resor, 437 F.2d 1020

(7th Cir. 1971). We adhere to the same position. As one court wrote:

> The exercises of discretion allowed are irreviewable. At the troublesome interface between the civil order and the sealed-off military sub-order with its own code of laws, system of justice and hierarchy of tribunals the task of the civil court is limited to determining whether or not the military has acted within the jurisdiction conferred on it by valid law; * * * the civil court would exceed its duty if it reviewed the exercise of discretion to see whether it was well or ill-founded by any substantial evidence rule.

Winters v. United States, 281 F.Supp. at 299.

■ The standard articulated thus parallels the basis in fact test applicable to review of Selective Service classifications under Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946), and succeeding cases. This court has expressly recognized the applicability of such a basis in fact test in a case involving an application for discharge from the Navy Reserve, Hollingsworth v. Balcom, 441 F.2d 419 (6th Cir. 1971). But at the same time, that decision reaffirmed the applicability of our rule, first enunciated in Schatten v. United States, 419 F.2d 187 (6th Cir. 1969), that violation by the military of its own regulations constitutes a violation of an individual's right to due process of law:

> Our reluctance to review discretionary military orders does not imply that any action by the Marines, even one violative of its own regulations, is unreviewable judicially. See 4 Davis, Administrative Law Treatise, §§ 28.-01, 28.16. Where Congress or administrative agencies themselves lay down procedures and regulations, these cannot be ignored in deference to administrative discretion. Smith v. Resor, 406 F.2d 141 (2d Cir. 1969). See United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct.

499, 98 L.Ed. 681 (1954); Yellin v. United States, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963).

Schatten v. United States, 419 F.2d at 191. See also Hammond v. Lenfest, 398 F.2d 705, 715 (2d Cir. 1968); Dunmar v. Ailes, 121 U.S.App.D.C. 45, 348 F.2d 51, 53 (1965).

■ Accordingly, the due process clause here requires us not to measure the Army regulations against some constitutional standard, but instead to determine whether the regulations were followed. The District Court, in colloquy with counsel, entertained some doubts as to whether they were, but concluded:

> [I]t is the opinion of this Court that petitioner had ample notice of impending activation as is required by the remainder of Army Regulation 135–91. Though a Court can never condone the Army's failure to comply with its own regulations, the Court is of the opinion that petitioner was provided with every consideration to which he is entitled under the statutes and the regulations.

■ We have made a careful examination of the record before the District Court, and we agree with its conclusion. There is no question that appellant received sufficient notice that he had accumulated several unexcused absences long before he was activated. Captain Ott, Antonuk's commanding officer, notified him on October 24, 1969, that he would request that appellant be ordered to active duty because of unexcused absences from Reserve drills, in accordance with AR 135–91, § 12e. There is nothing in the record to indicate that appellant made any attempt to question the validity of this determination before he actually received the activation notice on December 18, 1969.

The Army regulation concerning appeals of activation orders which was in effect at the time of appellant's activation, AR 135–91, § 20d, is annoyingly

cryptic.[1]  In contrast, § 16 of AR 135–91, concerning delays of appeals of involuntary activation orders, is replete with helpful detail.  It tells the reservist the authority which must consider applications for delay of activation, it describes in considerable detail what must and may be submitted with such applications, and it enumerates seven reasons authorizing delay.  However, Antonuk was not interested in seeking a delay, except insofar as it might be necessary to prosecute his appeal of the activation decision itself.  But the regulation on appeal, AR 135–91, § 20d, gave none of the information provided above except that it indicated the authority which would consider the appeal.  The regulation reads in full:

> d.  *Appeal of involuntary order to active duty.*  If an individual appeals his involuntary order to active duty for reasons other than those specified in this regulation [a reference to § 20a of AR 135–91, which does not apply to the present case], the denial of such appeal will be forwarded to CO, USARCPC, in accordance with c(2) (a) or (b).

Section 20c(2) (b) is applicable here:

> Area commanders and CO, USAAC, will forward denials of appeals for delay to the Commanding Officer, U. S. Army Reserve Components Personnel Center, Fort Benjamin Harrison, Indiana 46429 for processing under AR 601–25.

AR 601–25 apparently concerns "Delay in Reporting for and Exemption from Active Duty" and not the kind of appeal Antonuk sought.  Accordingly, the most that can be said for AR 135–91, § 20d, is that it prescribes a chain of command for reviewing appeals from involuntary activation orders.  A review of the record indicates that both Antonuk and the Army complied with the regulations in this respect; that is, the appeal went up through the designated channels.

However, that does not end our inquiry.  Our decisions in *Hollingsworth* and *Schatten* indicate that "although every form may have been preserved," there remains "the inquiry whether they have been more than an empty shell." Frank v. Mangum, 237 U.S. 309, 35 S. Ct. 582, 59 L.Ed. 969 (1915) (Holmes, J., dissenting).  In *Schatten,* we held that the petitioner's commanding officer's "abrupt refusal to permit the Appellant to exhaust his military remedies" violated Marine Corps regulations and 10 U.S.C. § 938 as well.  419 F.2d at 191–92.  And in *Hollingsworth,* we recognized that, although there may be a superficial compliance with form, the substance of rights guaranteed by military regulations might be effectively denied.  Hollingsworth was a Naval reservist who sought a discharge as a conscientious objector.  Under Navy regulations, he was entitled to what is called an 0–3 hearing, at which he was entitled to have his lawyer present.  The Navy claimed that the petitioner's commanding officer had conducted such a hearing—and he had—but when he bade petitioner attend, he did not inform him that this was the 0–3 hearing.  Accordingly, Hollingsworth did not bring his attorney.  The Court held that the failure to notify the reservist of the nature of the hearing he was bidden to attend constituted a denial of the right to an 0–3 hearing with an attorney present as conferred by military regulations.

The facts here present similar issues.  According to appellant's petition, "[a]fter Christmas, 1969 [that is, some time more than seven days after receipt of the involuntary activation order] Petitioner spoke to Captain Ott to inquire and request information regarding an appeal of his involuntary activation.

---

1.  We are informed by the parties that this regulation has been amended twice between that time and this writing.  According to amicus curiae, the regulation currently in force has not yet been published, but perpetuates the cryptic nature of the regulation with which we are concerned.

Captain Ott did not give Petitioner any such information, but instead instructed the Petitioner to read the company bulletin board. The information contained on the bulletin board pertained only to delaying the activation and not to appealing the activation order." Captain Ott's letter to Representative Nedzi, Antonuk's Congressman who had inquired about the activation order, neither confirms nor contradicts these allegations directly. Writing on January 9, 1970, Captain Ott reported:

> PV2 Antonuk received his orders for active duty in mid-December 1969. To date, approximately 30 days later [actually 23 days, according to the undisputed December 18 receipt date], I have not received anything in writing or otherwise from PV2 Antonuk indicating that he has any desire to appeal his being ordered to active duty.

The ambiguous phrase, "I have not received anything in writing or otherwise," might be read as contradicting Antonuk's statement that he asked the Captain how to appeal. But the phrase seems to contemplate a formal procedure, which Antonuk does not claim to have invoked at this date, and which he did invoke the next day by sending Captain Ott a letter formally requesting a reversal of his order to active duty. This appeal, and the two subsequent appeals filed by Antonuk on January 27, 1970, and March 29, 1970, were considered by the military officials designated by § 20d of AR 135-91, and all were found to be without merit.

We do not consider the Captain's advice to Antonuk on the method of appeal to have been responsive to his question in the manner required by *Schatten*. The notice on the bulletin board to which the Captain referred, and which appears in the record as "inclosure 3" of his letter to the Congressman, does not concern appeals from involuntary activation orders. It is entitled: "SUBJECT: Delay from Active Duty/ACDU

TRA." The only portion of the notice which is even remotely relevant to the question Antonuk asked is paragraph 2, which reads in full:

> Paragraph 16, AR 135-91, sets forth policies and procedures whereby delays may be authorized for individuals ordered to involuntary active duty for failure to participate satisfactorily in the Ready Reserve. Applications must be submitted in writing prior to publication of active duty orders except in emergencies.

At best, the notice gave Antonuk only a little more information concerning his applications for delay pending decision on the merits of his appeal. It gave him no information concerning the procedures required to make an appeal on the merits; nor did it even refer him to § 20d, which, as we have seen, provided very little pertinent information.

▌ The Government argues that any noncompliance with military regulations was cured by the fact that Antonuk did in fact submit appeals—including all relevant papers—which were duly considered, and that this was all to which he was entitled under AR 135-91, § 20d. We agree, but we observe that Captain Ott, in his letter transmitting Antonuk's first appeal to the appropriate military authorities, states:

> He [Antonuk] was further advised that the appeal had not been submitted within the time permitted by regulation (he had been properly notified of appeal procedures). He was further advised that the appeal probably would not be favorably considered in light of his delay in preparing his request.

The first two statements in that quotation are incorrect. Antonuk had not been properly informed of the appeal procedures available to him, as we have seen. And we can find no time limit for appeals from involuntary activation or-

ders under the Army regulations.[2]  Obviously, Antonuk's appeal could not have been late.  The last sentence seems to indicate that Antonuk's "delay in preparing his request" may have prejudiced the Captain's consideration of its merits.  If it could be shown that such an erroneous view of the applicable regulations infected the decision that was made, we would grant relief in accordance with *Schatten* and *Hollingsworth*.  But our examination of the record persuades us without a doubt that there was no such infection.  The authorities at Fort Benjamin Harrison had before them all the papers in appellant's service file, as well as the material he submitted.  This included copies of the doctor's notes which Antonuk claimed he had filed at appropriate times but which had been lost through careless record-keeping.  The officers who reviewed the activation orders were faced with what was essentially a credibility question.  Should they believe Captain Ott, who said that he had never received any medical documentation, and that appellant had admitted to him that he had not been in the doctor's office on one of the days when one of the notes placed him there?  Or should they believe Antonuk, who claimed that he had filed the excuses?  They apparently believed Captain Ott, and upheld his decision.

■ This is just the kind of discretionary military determination we should not disturb.  "[J]udges are not given the task of running the Army."  *Orloff v. Willoughby*, 345 U.S. 83, 93, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).  Our holdings in *Schatten* and *Hollingsworth* do

not go so far.  We decline to extend them any further.

■ The remaining issue concerns the length of active duty service to which appellant may be ordered.  Appellant's enlistment contract and acknowledgement, signed February 4, 1965, provides for 6 years' total military obligation, and further states:

> If in any year I [Antonuk] fail to perform satisfactorily any of the requirements set forth above, I can be ordered to perform active duty for training for a maximum of 45 days or be reported to Selective Service[3] for immediate induction.

Despite this contract language, the order activating appellant requires him to serve for one year, six months, and three days.  This is in accordance with 10 U.S.C. § 673a and 32 C.F.R. § 100.3(c) (now 32 C.F.R. § 100.3(e) ), the first of which provides, in pertinent part:

> A member who is ordered to active duty under this section may be required to serve on active duty until his total service on active duty equals 24 months.

There is no claim here that the term of active duty to which Antonuk was ordered was computed incorrectly under this standard.  This statute was first enacted as part of the Department of Defense Appropriation Act of 1967, 80 Stat. 980, § 101(a) and was made permanent by the Military Selective Service Act of 1967, P.L. 90–40.  Its purpose was "to assure greater equity in the fulfilling of military service obligations on the part of individuals who enlist direct-

---

2. Amicus curiae informs us that the regulation currently in force also does not contain a time limitation.  If this is true, it could obviously cause some difficulties for the Army in cases such as this.

   It is clear, of course, that Antonuk's requests for *delays* pending his appeal were out of time under the terms of AR 135–91, § 16.  But these requests—except for the last one—were all granted, and the District Court granted a stay of activation which remains in effect pending this appeal.  Antonuk is accordingly

not complaining of the treatment of *these* requests; he is, rather, complaining that his *appeals* on the merits were not filed out of time, because no time limit is specified in AR 135–91, § 20d.  And about this complaint he appears to be correct.

3. Since appellant was not ordered to report to Selective Service, any legal problems attendant to its procedures are not at issue here.

ly into the Reserve." U.S.Code Cong. & Adm. News, 91st Cong., 1st Sess., 1345 (1967).

Appellant concedes that Congress may, under its constitutional power to raise armies, abrogate the terms of Reserve enlistment contracts. He argues, however, that the Court should not construe § 673a to have done so. That section, he says, has been confused by other courts with § 673(a), whose obvious purpose is to produce large armies in times of national emergency. Section 673a, on the other hand, he claims, was intended not for this purpose, but for assuring greater discipline in Reserve units. Such a lesser purpose, he argues, cannot justify the overriding of a contractual obligation which should bind the Government as well as the enlistee, except in a national emergency.

But even if § 673a (as distinguished from § 673(a) ) was intended simply to preserve discipline, we are unpersuaded that it is unrelated to the war powers which Congress doubtless possesses. This is simply the war power at one remove, and the nexus between Reserve discipline and the power of the Congress to raise armies is not so attenuated that it can be considered nonexistent.

Accordingly, we join the vast majority of courts which have held that reservists may be activated pursuant to 10 U.S.C. § 673a, notwithstanding clauses in their enlistment contracts to the contrary. Winters v. United States, 281 F.Supp. 289 (E.D.N.Y.), aff'd per curiam, 390 F.2d 879 (2d Cir.1968); Karpinski v. Resor, 419 F.2d 531 (3d Cir.1969); Winters v. United States, 412 F.2d 140 (9th Cir.1969); Harmonson v. United States, No. 24005 (9th Cir.July 1970), rev'g Civil No. 68–2109, 2 S.S.L.R. 3151 (C.D.Cal.1969); Heuchan v. Laird, 314 F.Supp. 796 (E.D.Mo.), aff'd, 427 F.2d 980 (8th Cir.1970); Pfile v. Corcoran, 287 F.Supp. 554 (D.Colo. 1968). *Contra*, Gion v. McNamara, Civil No. 67–1563 E C (C.D.Cal. Jan. 9, 1968).

The judgment of the District Court is affirmed.