In the Matter of Sandy L. DELLAVER-SON, Private, USMCR, Petitioner,

v.

Hon. Melvin LAIRD, Secretary of Defense, et al., Respondents.

Civ. No. 72-396-GT.

United States District Court, S. D. California.

Nov. 7, 1972.

135

Charles R. Khoury, Jr., La Jolla, Cal.,
for petitioner.

Howard A. Allen, Asst. U. S. Atty., for respondents.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

GORDON THOMPSON, Jr., District Judge.

The above-entitled matter came on for hearing on an Order to Show Cause why a Writ of Habeas Corpus should not issue, releasing petitioner from the custody of the United States Marine Corps at Camp Pendleton, California, where he is now stationed awaiting court-martial proceedings on a charge of unauthorized absence. Article 86, Uniform Code of Military Justice (10 U.S.C. § 886).

The Court, having considered the testimony adduced at the hearing, as well as the pleadings and briefs of the parties, and being fully advised in the premises, makes the following findings of fact and conclusions of law:

### I

### FINDINGS OF FACT

1. On September 30, 1965, the petitioner voluntarily enlisted in the United States Marine Corps Reserve for a period of six years. Petitioner's obligations as a Reservist were set forth in a document entitled, "United States Marine Corps Enlistment Contract and Record" which was signed by the petitioner at the time of his enlistment. Paragraph 40 of that contract stated as follows:

"40. I understand that upon enlistment in the Reserve United States Marine Corps, or upon transfer or assignment thereto I may not be ordered to active duty without my consent except in time of war, or when in the opinion of the president a national emergency exists, or when otherwise prescribed by law, and that I may be required to perform active duty during such periods."

At the time of his enlistment petitioner also signed a "Statement of Understanding of Military Obligations." Paragraph C of that Statement of Understanding provides as follows:

"C. That as a member of the ready reserve I may be required (1) to participate in not less than 48 scheduled drills or training periods and to perform not more than 17 days of active duty for training during each year, or, (2) to perform annually not more than 30 days of active duty for training. If I fail to perform satisfactorily one or the other of the above in any year, I may be ordered, without my consent, to perform additional active duty for training for not more than 45 days. After this provision has once been invoked and my participation remains unsatisfactory, I may be subject to the priority induction features of the UMT&SA, as amended."

Thereupon petitioner entered into an active duty status for a period of six months which ended 17 April 1966. Upon the completion of his active duty, petitioner was transferred to a drill unit located in "Newcastle", Pennsylvania, for completion of his Reserve obligations.

2. On June 30, 1967, Public Law 90–40, 81 Stat. 105 (10 U.S.C. § 673a) became effective. This law changed the involuntary activation period from 45 days to 24 months in the event of unsatisfactory drill participation by a reservist. At approximately the same time, the Marine Corps changed its policy and began to require 100 percent drill attendance in place of the former 90 percent requirement.

3. Petitioner had performed 5½ years of satisfactory drill participation when he failed to attend the weekend drill of October 17–18, 1970. Petitioner telephoned his commanding officer on Friday, October 16, 1970, requesting to be excused from this drill period, due to the exigencies surrounding his being charged with a drug offense.

4. The petitioner satisfactorily participated at the November 1970 weekend drill.

5. Petitioner failed to attend the December 1970 weekend drill. Those in

charge at his drill unit were aware of the petitioner's alleged excuse for missing this meeting. However, petitioner was ultimately charged with an unexcused absence as to this drill period.

6. At the January 1970 drill weekend petitioner was informed that he was being recommended for involuntary active duty as a result of his unsatisfactory participation in the Marine Reserve program. The petitioner had a conversation with his commanding officer, during which he was told that the drill requirements had been changed from 90 to 100 percent per year attendance. Petitioner represented that he had valid reasons for his absences due to personal problems and that he desired an opportunity to present those reasons before being activated, in reply to which his commanding officer suggested that he apply for a hardship discharge.

7. On January 29, 1971, the recommendation of petitioner's commanding officer was forwarded to the Commandant of the Marine Corps, requesting that petitioner be involuntarily assigned to active duty. Attached thereto as Enclosure (1) was a typewritten statement, dated January 17, 1971, purportedly signed by the petitioner, which read as follows:

UNITED STATES MARINE CORPS
Service Company (——), Headquarters Battalion
4th Marine Corps Division, FMF, USMCR
MARINE CORPS RESERVE TRAINING CENTER
Newcastle, Pennsylvania 16101
IN REPLY REFER TO
17 Jan 1971

"STATEMENT OF PFC SANDY L. DELLAVERSON
2180760/4631 USMCR(K)"

Having been informed of my rights under Article # 31 UCMJ regarding my being (sic) recommended for Involuntary Active Duty for Training, I do not wish to make a statement at this time.

/s/
SANDY L. DELLAVERSON
(Resp. Exh. "A", p. 50)

The evidence is uncontroverted that this document was a forgery.

8. Subsequently, in response to his commanding officer's suggestion that he apply for a hardship discharge, the petitioner submitted to his command a hand-written letter, dated February 21, 1971. (Resp. Exh. "A", p. 43.) In this letter petitioner set forth various potential hardships he and his immediate family would experience should he be activated, but did not respond to the basic reasons for his proposed activation, i. e., the two missed drills of October and December 1970.

9. Petitioner's letter of February 21, 1971 was eventually forwarded to the Commandant of the Marine Corps, along with the forged "nonstatement" of January 17, 1971.

10. On April 25, 1971, orders were issued by the Director of the 4th Marine Corps District pursuant to the March 24, 1971 decision of the Commandant that petitioner be involuntarily activated. These orders required that petitioner report sometime in May 1971 for physical evaluation and activation for a period of 16 months and 16 days (24 months less the time already served by petitioner on active duty and active training duty). (Resp. Exh. "C".) Petitioner's orders were later modified, extending his reporting date to allow for completed processing of his request for hardship discharge which he officially filed on May 24, 1971. (Resp. Exh. "A", p. 21.)

11. An administrative discharge board of officers was convened on July 17, 1971 to hear petitioner's request for hardship discharge. Petitioner's Inspector-Instructor was appointed as senior member of this board, which recommended to the Commandant of the Marine Corps that petitioner's request be denied. This recommendation was approved on August 20, 1971. (Resp. Exh. "A", p. 5).

12. On September 1, 1971, by endorsement to the original orders to active duty of April 25, 1971, petitioner's reporting date was ultimately set as September 19, 1971. (Resp. Exh. "C", p. 3.) However, petitioner failed to report as ordered. On June 5, 1972, he was apprehended in Salt Lake City, Utah, while hitchhiking. Petitioner was delivered in

due course to Camp Pendleton, California, where he entered active duty on June 15, 1972 and was subsequently charged with unauthorized absence under the Uniform Code of Military Justice.

13. On September 22, 1972, this Court entered a temporary restraining order holding court-martial proceedings in abeyance, pending a determination as to the lawfulness of petitioner's orders to involuntary active duty, which temporary restraining order is presently in effect.

## II

## DISCUSSION

■ There is substantial authority for the general rule that a federal district court will refuse to review the discretionary rulings of the military. Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); Antonuk v. United States, 445 F.2d 592, 594 (6th Cir. 1971); O'Mara v. Zebrowski, 447 F.2d 1085, 1087 (3rd Cir. 1971); Schatten v. United States, 419 F.2d 187, 191 (6th Cir. 1969); Smith v. Resor, 406 F. 2d 141, 145 (2nd Cir. 1969); Fox v. Brown, 402 F.2d 837 (2nd Cir. 1968); Winters v. United States, 281 F.Supp. 289, 299 (E.D.N.Y.1968), affirmed per curiam, 390 F.2d 879 (2nd Cir. 1968), cert. denied, 390 U.S. 993, 88 S.Ct. 1193, 20 L.Ed.2d 93 (1968). As Judge Dooling so aptly explained in Winters v. United States, supra:

> "The exercises of [military] discretion involved are irreviewable. At the troublesome interface between the civil order and the sealed-off military sub-order with its own code of laws, system of justice and hierarchy of tribunals the task of the civil court is limited to determining whether or not the military has acted within the jurisdiction conferred on it by valid law; that includes the duty to determine, where an act of discretion is the bridge over which must lead the path of determining whether or not a quasi-civilian will be transferred from civilian to full military status, that the discretion has been exercised; the

civil court would exceed its duty if it reviewed the exercise of discretion to see whether it was well or ill-founded by any substantial evidence rule." 281 F. Supp. at 299.

At the same time, several of the above authorities have recognized an exception to the general rule where the military has failed to follow its own regulations in taking action against a serviceman. Antonuk v. United States, supra; Schatten v. United States, supra; Smith v. Resor, supra; Fox v. Brown, supra; O'Mara v. Zebrowski, supra. Judge Celebrezze, speaking for a unanimous panel of the Sixth Circuit in Schatten, supra, made clear that;

> "Our reluctance to review discretionary military orders does not imply that any action by the Marines, even one violative of its own regulations, is unreviewable judicially. See 4 Davis, Administrative Law Treatise, §§ 28.01, 28.16. Where Congress or administrative agencies themselves lay down procedures and regulations, these cannot be ignored in deference to administrative discretion." 419 F.2d at 191. See also Antonuk v. United States, supra, 445 F.2d at 595.

In Smith v. Resor, supra, a case involving the involuntary activation of an Army reservist, Judge Irving Kaufman of the Second Circuit, suggested the following procedure:

> "A federal court may properly examine the decision to call a reservist for active duty in order to determine if the reservist's procedural rights under the applicable statutes and military procedures and regulations were violated in a manner which caused substantial prejudice to the reservist. [Footnote omitted] This does not involve any undue interference with the proper and efficient operation of our military forces because we require only that the Army carry out the procedures and regulations it created itself." 406 F.2d at 146.

The rationale that permeates the above cases, of course, is that: "Violation by

the military of its own regulations constitutes a violation of an individual's rights to due process of law." Antonuk v. United States, *supra,* 445 F.2d at 595.

The regulations which governed the involuntary activation of the petitioner are contained in Marine Corps Order P1001R.43 dated 19 June 1964, entitled Marine Corps Reserve Standing Operating Procedures [MCO P1001R43 (RESSOP)]. The only portion of MCO P1001R43 (RESSOP) which deals specifically with the procedure to be followed in a case of unsatisfactory participation in the reserve program is Subparagraph 2102.2. It provides, in part, as follows:

"b. All recommendations for assignment to active duty by reason of unsatisfactory participation will be submitted, via the chain of command, within 30 days after the reservist becomes unsatisfactory, to the Commandant of the Marine Corps (Code AFA) and *will include,* but are not limited to, the following information:

(1) A complete resume of the circumstances which prompted the recommendation for assignment to active duty and, if appropriate, a statement as to whether the individual was afforded an opportunity to perform EIOD [Equivalent Instruction or Duty]

(2) *Statement of individual.*

(3) Number and relationship of dependents.

(4) Physical profile (PULHES).

(5) All *prior service showing* active duty, active duty for training, and involuntary active duty training periods.

(6) Time lost." (Emphasis added.)

Respondents do not deny that the petitioner had a right to appeal the decision of his commanding officer recommending him for involuntary active duty. A dispute arises only as to the manner in which this was to be accomplished. The Court is convinced that a full and formal hearing was not necessary. Antonuk v. United States, *supra,* 445 F.2d at 594. However, the Court is just as certain that once respondents chose to promulgate a review procedure, however perfunctory, due process required that they adhere strictly to it.

In the case at bar the prescribed procedure for bringing the reservist's objections to the attention of higher authority must be gleaned from the above quoted language, specifically, MCO P1001R.43 (RESSOP), paragraph 2102.-2(b). Fairly interpreted, the regulation contemplates that prior to his decision to activate a reservist, the commandant of the Marine Corps must have before him a statement from the reservist justifying, explaining, or mitigating the charge that his participation in the reserve program has been unsatisfactory. In petitioner's case the charge was two missed drills. Thus, it would be only natural for the petitioner to attempt to explain why he had been absent. It is clear that there are reasons for which an absence from a drill can be excused. MCO P1001R.43 (RESSOP), paragraph 2052.3 lists several, including:

"e. When attendance at a drill would create a serious and unusual hardship on either [the reservist] or his immediate family due to an unforseen emergency."

Petitioner contends that his absences were in fact attributable to such hardships and should have been excused by his commanding officer. Our concern lies only with the alleged failure of the respondents to afford petitioner the opportunity to present his side of the story to the commandant of the Marine Corps in accordance with the Marine Corps' own regulation.

Whoever prepared the paperwork recommending petitioner for involuntary active duty was well aware of the regulatory requirement that petitioner's statement be included therewith. In compliance with the regulation, a document, dated January 17, 1971, and purporting to be petitioner's statement in the matter was attached to the commanding officer's recommendation as Enclos-

ure (1). However, there was uncontroverted evidence that this document was a forgery, and respondents were unable to otherwise demonstrate that petitioner was afforded the opportunity to reply to his commanding officer's charges of unauthorized absence.

Respondents rely, rather, on the fact that there was ultimately forwarded to the commandant of the Marine Corps a handwritten letter of petitioner, dated February 21, 1971, which set forth certain hardships experienced by the petitioner's immediate family. Petitioner testified at the hearing that he wrote this letter in response to his commanding officer's suggestion that he apply for a hardship discharge, a procedure far removed from the one here under scrutiny. The letter itself evidences the petitioner's intent therein to speak to the prospective problems of his family, rather than to the reasons why he missed the October and December 1970 drills.

It is, therefore, clear to the Court that this correspondence was meant to fulfill a function quite different from that contemplated by paragraph 2102.2 of MCO P1001R.43 (RESSOP). Therefore, it could not serve as an adequate substitute for the petitioner's required statement and failed to cure the respondents' earlier foreclosure of petitioner's right to appeal his activation on the merits. If anything, the February 21, 1971, letter is evidence of petitioner's confusion as to his rights, apparently engendered by the earlier suggestion of his commanding officer that his only remedy lay in the direction of a hardship discharge. At best, this advice caused petitioner to divert his energies to the task of establishing prospective family hardships, while the merits of the charges against him went unanswered.

■■ It cannot be presumed that the review process established by the Marine Corps is merely an empty shell and that higher headquarters would simply have "rubber stamped" the recommendation of petitioner's commanding officer no matter what petitioner might have alleged in his defense. Therefore, since petitioner was effectively precluded from presenting anything of substance to higher authorities, a finding of material prejudice is inescapable. Despite this Court's wholehearted agreement with Justice Jackson that, "judges are not given the task of running the Army", Orloff v. Willoughby, *supra*, 345 U.S. at 93, 73 S.Ct. at 540, it must recognize its obligation to protect the constitutional rights of citizens, however much they may be circumscribed due to their status as members of the armed forces. Cf. O'Mara v. Zebrowski, *supra*, 447 F.2d at 1089. Thus, although the petitioner was not entitled to a full formal hearing concerning the circumstances that prompted his involuntary activation, Antonuk v. United States, *supra*, 445 F.2d at 594, when the Marine Corps established a review procedure, however abbreviated, by which the petitioner was entitled to pursue an appeal from the decision of his commanding officer to recommend him for active duty, the Marine Corps was bound to insure that that procedure was followed. In failing to do so, respondents denied petitioner due process of law.

■■ Having determined that petitioner's fundamental right to due process has been violated, we face the further question of a proper remedy. At the outset, it appears that petitioner's orders to active duty are invalid as the end product of the due process violation. There appears to be some doubt, however, as to whether habeas corpus is available where a reservist is transferred to active duty status. See Schatten v. United States, *supra*, 419 F.2d at 191. In *Schatten*, a case similar on its facts to Dellaverson's, the Sixth Circuit Court of Appeals chose to treat the petition as one for mandamus under 28 U.S.C. § 1361, and remanded the cause to the District Court with instructions that it direct the Marine Corps to permit the reservist to avail himself of the procedures the Marine Corps had established for

review. Schatten's orders to active duty had been stayed by the District Court pending appeal. This Court finds little difference in directing the Marine Corps to transfer the petitioner to inactive duty status at his former drill unit, thereupon permitting him to pursue his military remedies as established by the Marine Corps.

██ Should petitioner's appeal be unsuccessful, he would be liable to serve the remainder of his 16 month and 16 day "delinquency" tour of active duty. The Court finds no merit in the petitioner's argument that activation of a reservist under Public Law 90–40 (10 U.S.C. § 673a) for more than 45 days, in contravention of his Statement of Understanding executed upon enlistment, deprives him of valuable contract rights without due process of law. See Even v. Clifford, 287 F.Supp. 334 (S.D.Cal.1968); Pfile v. Corcoran, 287 F.Supp. 554 (D. Colo.1968); Antonuk v. United States, *supra*, 445 F.2d at 598–599; Winters v. United States, *supra*. Cf. Fox v. Brown, *supra*.

### III

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under 28 U.S.C. § 1361.

2. Respondent's failure to afford petitioner an opportunity to present his objections to higher military authority, concerning his proposed involuntary assignment to active duty, violated Marine Corps regulations and thereby deprived petitioner of due process of law.

3. Petitioner's orders to involuntary active duty, stemming as they do from the aforementioned deprivation of due process, are invalid and unenforceable against petitioner.

4. Petitioner is entitled to be transferred forthwith to inactive duty status with his former Marine Reserve component, and to be credited with all time served on active duty since June 15, 1972.

5. Respondents may reinitiate proceedings to involuntarily activate petitioner, in strict compliance with Marine Corps regulations as to consideration and review of petitioner's objections thereto.

6. Public Law 90–40 (10 U.S.C. § 673a) does not deprive petitioner of valuable contract rights without due process of law.

Wherefore, it is ordered that respondents be permanently enjoined from proceeding with the court martial of petitioner formerly scheduled for September 25, 1972.

It is further ordered that respondents transfer petitioner forthwith to inactive duty status with his former Marine Reserve component and credit him with all time served on active duty since June 15, 1972.

It is further ordered that petitioner submit an appropriate final judgment in accordance with the foregoing findings of fact and conclusions of law and order, pursuant to Local Rule 7.