John T. ROHE, Petitioner,

v.

Robert F. FROEHLKE, Secretary of the Army, and Commanding General, First United States Army, Ft. George Meade, Md., Respondents.

No. 73-C-887.

United States District Court,

E. D. New York.

Dec. 12, 1973.

Kunstler, Kunstler & Hyman, New York City, for petitioner; Steven J. Hyman, New York City, of counsel.

Robert A. Morse, U. S. Atty., Eastern District of New York, for respondents; Thomas A. Illmensee, Asst. U. S. Atty., of counsel.

BARTELS, District Judge.

Petitioner, John T. Rohe, applies for a preliminary and permanent injunction and a writ of mandamus directing the above respondents to cancel petitioner's order to active duty as an unsatisfactory reservist, and to cancel warrants outstanding against him for failure to obey orders to active duty. On June 22, 1973, the Court stayed the removal of Rohe from the jurisdiction of the Eastern and Southern Districts of New York, released him from the physical custody of the respondents and returned him to duty as a New York City policeman until the determination of this action. No answer has been filed but, instead, the Government has moved for summary judgment pursuant to Rule 56(b), F.R. Civ.P., which Rohe opposes.

Rohe, a New York City policeman, enlisted in the New York Army National Guard on November 9, 1967, for a term of six years, and thereby became a member of the Army National Guard of the United States. On March 31, 1972, he was ordered to active duty for 19 months and 4 days, to begin April 17, 1972, for unsatisfactory participation in his Army Reserve Unit, consisting of failure to attend summer camp beginning June 26, 1971, to which he was commanded. He attempted to excuse his failure to appear upon the claim that he notified his unit prior to summer camp that he was ill; that he had a police department medical examination scheduled for June 28, 1971, and that he was on sick report from the police department on June 26, 1971, pursuant to whose regulations he could not leave his residence. The diagnosis was gastroenteritis, i. e., inflammation of the stomach and intestines. Rohe was interviewed by the Battalion Surgeon on the last drill prior to summer camp, who informed him that he was not too sick to refuse to attend summer camp as required by AR 135–91(5, d.(3)), and that he would be fully examined at Camp Drum. The reason for this examination would be to determine if a medical discharge was warranted, considering Rohe's long record of excused absence from drills for illness. When Rohe's reserve unit was mustered for summer camp on June 26, 1971 and he failed to appear, the clerk of the reserve unit informed Rohe that he could only be excused on the ground of sickness if he were so excused by the Battalion Commander. The records of the police department indicate that Rohe reported on a weekend sick report at his precinct at 9:20 A.M. on June 26, 1971, was signed out at 10:15 A.M. and on June 27, 1971 was examined by a Police Surgeon and returned to full duty on the same day. On June 28, 1971, Rohe was notified by his commander that he was being carried on AWOL status and should report to the unit, but Rohe failed to report to his unit at summer

camp and went from AWOL status to deserter status.

■ On September 15, 1971, Rohe was officially informed by letter that active duty orders had been requested from the unit commander; that he could file his appeal to the Appeal Board within fifteen days, and that his unit commander would explain the proper filing procedure if he so desired. On September 22, 1971, without seeking advice from his unit but with advice of Legal Aid police counsel, Rohe filed his appeal, which in nineteen paragraphs he attempted to explain his position that he was on sick report by the police department for June 26, 1971, and consequently had a valid reason for not proceeding to camp. Attached to such petition was a document with a notation by Dr. Leonard Fox, Police Surgeon, stating that the petitioner was confined to home for medical reasons on June 26th and 27th.[1] However, Rohe did not mention in that petition that he had been ordered to report to his unit on June 28, 1971, nor the fact that according to the letter of the Commanding Officer of the Medical Section of the Police Department, the records of that Section indicated that he was returned to full police duty on June 27, 1971, nor the fact that at no time did he make an effort to communicate with his unit while it was at camp. Instead, he stated in his letter of appeal, paragraph 11th: "On July 11 my unit returned from summer camp. By that time I had seen my police department surgeon and had been ordered back to duty."

On September 28, 1971, Assistant Adjutant General notified Rohe that his appeal had been received and would be forwarded to his Commanding Officer for comments and recommendations, and that upon receipt of the unit commander's recommendation, "this office will advise you concerning the status of your appeal." Captain DiTullio, the Unit Commander, recommended denial of Rohe's appeal, rejecting, as was his right, an alternative recommendation by the Inspector General that Rohe be permitted to fulfill his obligation by equivalent summer camp training with another unit. On October 21, 1971, the Adjutant General, as a part of the appellate procedure, required the Company Commander to respond to Rohe's allegations on a point-by-point basis.[2] On January 15, 1972, the Company Commander made such a response to the Appeal Board, and in that connection the statements of Battalion Surgeon Petrillo and of First Sergeant Santagata, as well as the letter from the police department, were sub-

[1.] Rohe claims that this document as well as the written suggestion of the Inspector General that Rohe be rescheduled for another summer camp with another unit were not included in the Appeal Board file since they were not in the Court file. This claim seems to be frivolous because Rohe's letter of appeal included this document and also referred to the Inspector General's recommendation. Moreover, the Government has submitted certification by Colonel William B. Carne, Chief, Litigation Division, Office of the Judge Advocate General, that these documents were, in fact, in Rohe's Appeal Board file. The latter recommendation, pursuant to AR 135–91(9), is not binding upon the unit commander, and its rejection by him is not reviewable by this Court. Caruso v. Toothaker, 331 F.Supp. 294 (M.D.Pa.1971).

[2.] Interim correspondence between October 21, 1971 and January 15, 1972, was as follows: On October 28, 1971, Rohe's unit transmitted to the Adjutant General's Office (AG) specific responses to the appeal letter which included Police Surgeon Leonard Fox's undated note, Rohe's letter to the Inspector General, Company Clerk Frank S. Green's statement of October 27, 1971, a letter from the Inspector General, and additional copies of statements taken from Sergeant Santagata and Battalion Surgeon Petrillo. On November 3, 1971, the AG requested further specific statements with respect to the involvement of the Inspector General, and police records, and on December 1, 1971, he requested further comments and information concerning the information from the New York Police Department and also concerning Rohe's attendance at meetings and summer camp. In reply thereto, the Company Commander forwarded the letter of January 15, 1972, which included a copy of the letter from the New York Police Department, among other things.

mitted. In both of these statements Petrillo and Santagata claimed that Rohe admitted he was not sick at the time but was on vacation and that he had flushed a letter from the police department regarding his police medical examination down the toilet. The Appeal Board denied Rohe's claim and ordered him to active duty. It is from this decision that Rohe seeks redress, claiming that he had no knowledge of the Petrillo and Santagata statements which the Unit Commander had forwarded to the Appeal Board and inserted into the file, and consequently had no opportunity to refute them on appeal. Accordingly, petitioner claims that the appeal procedure did not conform to Army Regulation 135-91, ¶ 20, and to the requirements of due process inasmuch as he was not afforded a meaningful and effective appeal.

## II

Army Regulation 135-91(11) specifically provides that a member of the Army Ready Reserve who fails to participate satisfactorily to attend or complete annual training will be ordered to active duty for a period which, when added to his prior service for a full-time training duty, will total twenty-four months. Before requesting that such a member be ordered to active duty, the unit commander must determine under Army Regulation 135-91(11)(b) "if the member was notified in sufficient time to comply, and whether or not emergency or cogent reasons existed for his absence." Upon determination that these conditions have been satisfied, the commander must reduce to grade E-2 a member in grade E-3, and thereupon he must forward a request to the appropriate area commander that the member be ordered to active duty. Thereafter the unit commander must immediately notify the member of the action taken, and advise him that he will be required to enter active duty in or about thirty days after such notification.

A member who has been denied a requested delay of an order to active duty may appeal within fifteen days of the receipt of such denial. In such an appeal he is required to explain those facts pertinent to his case which he feels were not fully considered, and he may submit any additional evidence which he wishes to present. Paragraph 20, b. of the above regulations provides that appeal should be submitted through the unit commander, who in this case was Captain DiTullio, to the commander having authority to approve discharges or delays, who in this case was the New York State Adjutant General. Paragraph 20, c. provides that the State Adjutant General as approving authority may approve the delay. But when a denial of an appeal is "indicated" he must forward the appeal, records, and his recommendations to the United States Army Reserve Components Personnel and Administration Center at Fort Benjamin Harrison, Indiana. ¶ 20,c.(2)(a). In accordance with ¶ 20,e. the commanding officer at Fort Benjamin Harrison must convene an appeal board which gives the commanding officer its recommendations. There is no requirement that the unit commander's recommendations or the State Adjutant General's recommendations, which are based on the unit commander's recommendations, be forwarded to the reservist who appeals. In AR 135-91(20,e.) it is specifically provided that in processing the appeal the provisions of AR 15-6 "will not be applicable to such proceedings." AR 15-6, referring to the procedure to be utilized in investigations recommending adverse personnel action, specifically reads in part as follows:

" . . . the individual who is the subject of the investigation will be provided an opportunity to review all relevant material in the file, subject to security standards and questions of privilege, including the major commander's proposed recommendation for action to the Secretary. The individual will be permitted to rebut any adverse evidence and to submit any statement or relevant evidence that he desires."

Thus, the right to review all relevant material in the file and to rebut adverse evidence is by express implication specifically excluded under an appeal taken pursuant to AR 135–91(20,e.). However, Army regulations do provide for access and review of personnel records by the individual concerned or his authorized representative, CFR § 518.15(c), and further, that copies of Army records will be made available upon proper request if the record requested is described with sufficient particularity "to enable the Department of the Army to locate the record with a reasonable amount of effort." CFR § 518.5(a).[3]

### III

■■ It appears to be well settled that courts will not attempt to review purely discretionary decisions of military officials within their jurisdiction (see Smith v. Resor, 406 F.2d 141 (2d Cir. 1969).) They will, however, determine whether the military has complied with their own regulations in reaching such discretionary decisions. Hammond v. Lenfest, 398 F.2d 705, 710 (2d Cir. 1968). Nevertheless, they have in this context consistently rejected the suggestion that they, in effect, rewrite the military's internal procedures in order to meet the claims of a particular individual. Only in extraordinary circumstances will they inject themselves into the internal operations of the military. O'Mara v. Zebrowski, 447 F.2d 1085 (3d Cir. 1971). Accordingly, courts have held that the rights of a reservist involuntarily called to active duty for unexcused absences are adequately protected by a military regulation providing for a written appeal without a hearing. Ansted v. Resor, 437 F.2d 1020 (7th Cir. 1971); Hagopian v. Knowlton, 470 F.2d 201, 208 (2d Cir. 1972).

Here, Rohe had full knowledge of the requirements which must be satisfied in order to be excused for sickness or for any other reason. Indeed, on February 4, 1969, he signed an orientation statement, which he acknowledged he understood and in which it was specifically stated:

> "You are required to attend all periods of duty, unless specifically excused prior to the performance of such duty by your unit commander. Excuse from duty will be confined to exceptional cases only, such as sickness, injury, emergency or other circumstances beyond your control. *All such instances require substantiation by appropriate affidavits or certificates by a medical officer.* Employment conflicts, overtime, schooling, and loss of income are not normally considered valid reasons for absence from training." (Emphasis added.)

■ The above paragraph tracks the language of AR 135–91(9). It is not denied that Rohe did not substantiate his absence from summer camp "by appropriate affidavits or certificates by a medical officer" at any time. We find nothing in the regulations or elsewhere which requires that in an appeal from a reservist's involuntary call-up, the reservist is entitled to know not only what the charge is but also to require the Appeal Board to automatically furnish him with any statements or recommendations that might be inserted into the file by the unit commander. We find no basis for the charge that the military failed to comply with their own regulations in deciding petitioner's appeal.

■ The criterion in this type of case for a meaningful and effective appeal is whether petitioner had full knowledge of the charges against him and an opportu-

---

3. An affidavit was furnished to the Court by Major William M. Toohey, in which he swore that he served as the Recorder on the Involuntary Active Duty Appeal Board and had custody of the official records relating to such appeals during the time that Rohe's appeal was being processed and reviewed and further, had Rohe requested copies of documents in his military file, he would have provided Rohe with copies of such documents as might have been described by Rohe.

nity to respond thereto. The essence of the charge against Rohe was that in spite of the recommendation to him by the Battalion Surgeon after an interview on June 26, 1971, that he was not too sick to be excused from initial attendance at the summer camp, he nevertheless refused to proceed to camp. This was after he had failed to supply any affidavits from a medical doctor concerning his alleged illness. Statements which petitioner claims are false were made not only by the Battalion Surgeon but also by First Sergeant Joseph Santagata, who was also a sergeant on the police force.[4] The letter from Charles K. Sibon, Captain, Commanding Officer, Medical Section of New York City Police to the Commanding Officer of petitioner's battalion, in referring to Rohe's sickness, specifically states, among other things:

"Records further indicate he reported to Week-End Sick Report at the Medical Section at 0920 hours and signed out at 1015 hours, June 27, 1971. He was examined by Police Surgeon, Dr. Leonard Fox, who returned him to full duty effective 0800 hours the same day, June 27, 1971—diagnosis = Gastro-enteritis."

The Company Clerk, Frank S. Green, also forwarded a letter, dated October 21, 1971, to the Unit Commanding Officer stating that he had telephoned Rohe on June 26th and told him that he could not be carried as sick unless the battalion doctor examined him, to which Rohe replied "impossible" and he was thereupon notified by Green that he would be carried as AWOL. The claim that the statements appearing in the appeal file made by the military personnel to the effect that Rohe admitted he was not sick were false, would under the circumstances appear to have little relevance because the fact seems to be established that Rohe was well enough to proceed to camp on June 27, 1971, and moreover, these allegedly false statements made no reference to Rohe's failure to report on June 28, 1971. Rohe knew why his active-duty orders were requested. He knew that the Unit Commander would make recommendations which could hardly be favorable to him, and he had sufficient prior notice of his remedy. Cf., United States ex rel. Sledjeski v. Commanding Officer, 478 F.2d 1147 (2d Cir. 1973). Rohe's appeal, which was not supported by medical documentation and which was limited to failure to report on June 27th, failed to convince the Appeal Board that his claim was meritorious.

IV

Petitioner contends he has been deprived of procedural due process with respect to the appeal. We find that the procedures here employed in the context of the call-up order complied with the requisites of due process. It is clear that procedural rules which fail to satisfy due process in one context, may satisfy procedural due process in another context. Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 383 (1971); Antonuk v. United States, 445 F.2d 592, 594 (6th Cir. 1971). To paraphrase the principle, due process must be tailored to the contextual background and the necessities of the situation. Thus, military personnel are not in a position to evoke the same range of rights enjoyed by civilians. O'Mara, supra. In dealing with enlisted reservists, like Rohe, we must keep in mind that they voluntarily subject themselves to the jurisdiction of the Army and accordingly are in a class

---

4. A portion of the statement from the Police Sergeant reads as follows:

"When PV2 Rohe returned, I questioned him and asked to see the letter and asked him for the name of the Police Surgeon. I informed him that I was a sgt on the police force and that I would be able to check on his story with the police surgeon. Upon further questioning, PV2 Rohe told me that he was not on sick leave but on vacation; that he had an appointment at a clinic and not at a hospital and that when I asked to see the letter, he said that he had flushed it down the toilet bowl."

distinct from inducted service men. Brown v. McNamara, 387 F.2d 150, 152 (3d Cir. 1967). When such reservists enlist, they are subject to orientation annually and are informed of the consequences of failure to participate satisfactorily in unit training assemblies. AR 135–91(13)(a). Rohe knew the requirements to be satisfied if he wished to be excused for sickness, and he also was aware of his right to appeal, which he exercised, fully explaining his position.

As we have previously observed, the military regulations do not require the Appeal Board to send to an enlisted reservist papers that are placed in the file by his commander after the appeal has been filed. However, under the Army regulations such papers were available upon request. This should be sufficient to satisfy due process. By the statement in his appeal it was obvious that Rohe contended that he was sick and that he would deny the Petrillo and Santagata statements. Under the circumstances, it seems to us that admissions made to Petrillo and Santagata by Rohe, even if false, would have but a slight cumulative effect not sufficiently important to be harmful. At most, a credibility question was involved upon a relatively minor point. As stated in Antonuk v. United States, *supra*, 445 F.2d at 598:

"The officers who reviewed the activation orders were faced with what was essentially a credibility question. Should they believe Captain Ott, who said that he had never received any medical documentation, and that appellant had admitted to him that he had not been in the doctor's office on one of the days when one of the notes placed him there? Or should they believe Antonuk, who claimed that he had filed the excuses? They appar-

ently believed Captain Ott, and upheld his decision.

This is just the kind of discretionary military determination we should not disturb."

Thus, we cannot find that the action of the Appeal Board was arbitrary or capricious or lacking in due process. See Caruso v. Toothaker, 331 F.Supp. 294 (M.D.Pa.1971).

Petitioner cites as applicable to his case, Gonzales v. United States, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467, (1955); Crotty v. Kelly, 443 F.2d 214 (1st Cir. 1971); United States v. Purvis, 403 F. 2d 555 (2d Cir. 1968), and Violi v. Reese, 343 F.Supp. 462 (E.D.Pa.1972), which involve criminal prosecutions of pre-induction and in-service conscientious objectors under the Selective Service Act. In those cases the Army regulations require a hearing and provide for a right to file a statement before the Appeal Board predicated upon the facts in the file. Frequently those files contained adverse information which was heavily relied upon by the Local Draft Board and sometimes was the sole basis for its decision. The due process requirements in conscientious objector cases are obviously in a higher bracket than those applicable to cases involving enlisted reservists. We believe reliance upon these cases by the petitioner is misplaced.

Therefore, we conclude that the Army fully complied with its regulations pursuant to AR 135–91(16) and (20), and with the requirements of procedural due process applicable to the circumstances. Petitioner's request for a preliminary and permanent injunction must be and hereby is denied. The Government's motion for summary judgment is granted.

So ordered.